E-FILED
Wednesday, 04 June, 2025  09:59:08 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| AMIT SINHA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  24-cv-1059 |
| | ) | |
| BRADLEY UNIVERSITY, | ) | **Plaintiff demands trial by jury.** |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

Plaintiff, AMIT SINHA, by and through his attorneys, JULIE L. GALASSI, and

HASSELBERG, ROCK, BELL & KUPPLER, LLP, states the following for his Response to

Defendant's Motion for Summary Judgment:

### Introduction

Sinha became Chair of the FQM department of the Bradley Business College

in 2013 and was removed from that position in 2017. Sinha filed suit against

Bradley in 2018 because of his forced removal as Department Chair. Sinha was

unsuccessful in his lawsuit which ended in April 2021. For approximately 5 years

under Provost Zakahi, the Finance Department was chaired by individuals outside

of the Finance Department. Faculty had no input on the selection of a department

chair (internal and external) despite the Faculty Handbook's guidelines.

The Faculty Handbook provides that election of a department chairperson is

the responsibility of the faculty of the department. The Dean's role is that of a

facilitator, and in most cases the voice of the faculty shall be heard before that of

the Dean. The winner of the election is subject to ratification by the Dean. If the Dean does not ratify the winner for reasons pertaining to the winner's inability to competently perform the role, the Dean must inform the Department of the decision and explain the rationale for the decision in a meeting with the faculty. The Dean must then call for a special election to be held as soon as possible.

Between July 2020 and March 2021, Sinha was selected for and/or expressed an interest in open chaired professorships, administrative roles and chair of the department. Sinha's dean and department chair, Matthew O'Brien, reported that Provost Zakahi objected to Sinha serving in any of the aforementioned roles. After meetings with the Provost, O'Brien reported that, as long as Zakahi was Provost, Sinha would not be the Department Chair even though O'Brien wanted Sinha to be the chairperson. The Provost said the next Dean would decide about the Chair of the Finance Department.

In May 2021, the process to hire an external chairperson began with Stephen Kerr from accounting serving as the Finance Department Chair beginning at the start of the 2021-2022 school year.

Sinha had been raising concerns about the chair election process not being followed as set forth Faculty Handbook. This prompted a visit to Sinha by the new Dean 10 days after she started work. Dean Gribb accused Sinha of obstructing the process if the handbook election guidelines were followed and under no circumstance would she ratify Sinha's election as chair. Sinha became aware Gribb had told others that she would follow the handbook but would not ratify Sinha. The

2

outside search for a new faculty member who would serve as chair was apparently abandoned due to finances.

On February 4, 2021, Sinha was so concerned about Gribb he reached out to Bradley's attorney, Erin Kastberg for clarification that the events of 2017 and his lawsuit would not be a death sentence to his career. Kastberg assured Sinha on February 7, 2021, that he was not terminally banned from becoming Chair but he needed to rebuild trust. Kastberg suggested Sinha undertake some personal and professional training to rebuild trust. Kastberg did not indicate she knew about Sinha's present relationship with faculty and administration members or the efforts he had already expended to further his personal growth after being removed as chair 5 years previously.

On February 24, 2021, Sinha won the Finance Chair election by a unanimous vote. Gribb did not ratify Sinha's election. On February 25, 2021, Gribb requested a meeting to discuss the election and directed Sinha to prepare a document listing personal and professional activities undertaken to address department toxicity.

In a meeting on March 4, 2021, Gribb met with Sinha and Interim Dean Paul Stephens. Gribb said she would not ratify Sinha's election falsely claiming there were no professional development activities in his toxicity document and despite Stephens' reminder that no such requirement exists to become chair. Sinha told Gribb that the voice of the faculty shall be heard before that of the Dean. Gribb, without authority, claimed the lack of professional development negated the Handbook rule. Gribb never informed the department's faculty about her decision or

the rational for it as the Faculty Handbook demands and Gribb had promised to follow.

Sinha's claim for retaliation followed Gribb's decision. Bradley concedes Sinha has established the elements of a prima facia case of retaliation except for the final element of causation.

Sinha has produced evidence that the cause of the denial of his election as Chair goes well beyond Bradley's simplistic argument that policy violations are irrelevant and Sinha's personal and professional memorandum "toxicity document" did not establish any professional development activities. Sinha has produced more than sufficient evidence from which a fact-finder could conclude the non-ratification of Sinha's election was based on his prior protected activities. At best, Defendant has produced evidence that a jury might conclude the true cause of the non-ratification decision was lawful. Because that evidence is <u>not</u> uncontradicted, Sinha's entitled to a jury trial.

<u>List of Plaintiff's Exhibits Referenced Herein</u>

Exhibit 1 – Crystal Elliot Deposition

Exhibit 2 – Stephen Kerr Deposition

Exhibit 3 – Molly Gribb Deposition

Exhibit 4 – Walter Zakahi Deposition

Exhibit 5 – Paul Stephens Deposition

Exhibit 6 – Matthew O'Brien Deposition

Exhibit 7 – Amit Sinha Deposition

Exhibit 8 – Erin Katsberg Deposition

Exhibit 9 – Walter Zakahi Deposition from Sinha's 2018 Lawsuit

Exhibit 10 – Procedures

Exhibit 11 – Sinha's contemporaneous Notes

Exhibit 12 – Addressing the Toxicity Issue

<u>Response to Undisputed Material Facts</u>

<u>Undisputed Material Facts</u>

1.    Sinha is employed as a Professor of Finance at Bradley. (Complaint. ¶ 9 [ECF # 1, p. 2] and Answer, ¶ 9 [ECF # 8, p.2]).

2.    In 2013, Sinha began serving as the elected Chair of the Department of Finance and Quantitative Methods at Bradley. (Sinha Dep., p.32, line 22).

6.    On July 31, 2017, Sinha filed a charge of discrimination against Bradley claiming that his removal as department chair on March 22, 2017 was based on national origin and sex discrimination and retaliation. (Sinha Dep. p. 4, lines 11-24 and p. 5, lines 1-2 and Ex. 1).

7.    On February 28, 2018, Sinha filed a charge of discrimination against Bradley alleging that he was not promoted in retaliation for filing his July 31, 2017 charge. (Sinha Dep. p. 5, lines 5-14 and Ex. 2).

8.    On August 31, 2018, Sinha filed a lawsuit against Bradley in the United States District Court for the Central District of Illinois on the basis of the allegations of his 2017 and 2018 charges of discrimination. (Sinha Dep. p. 5, lines 17-24 and Ex. 3).

9.    Judgment was entered in favor of Bradley in Sinha's 2018 lawsuit, and that judgment was affirmed by the United States Court of Appeals for the Seventh Circuit in a decision issued on April 26, 2021. *Sinha v. Bradley University*, 995 F.3d 568 (7th Cir. 2021).

10.    In January of 2022, Dean Molly Gribb determined that an election for a department chair should be held in what was then known as the Finance Department. (Gribb Dep. p. 11, lines 13-24 and p. 12, lines 1-4).

11.    Sinha won the election to be Chair of the Finance Department. (Gribb Dep., p. 23, lines 17-19).

12.    Bradley's Faculty Handbook provides procedures for the election of department chairs which include that any election must be approved and ratified by the dean of the college. (Sinha Dep. Ex. 6, pp. 25-30 (Bates stamped Sinha 000021-000026)).

13.    Sinha claims that Dean Gribb told him prior to the election that she would not ratify the election if he won, mentioning that she had heard about the reputation of the Department and read about Sinha's removal as Chair prior to the completion of his term. (Sinha Dep. p. 42, lines 17-24 and p. 43 lines 1-17 and Ex. 6, pp. 6-7 (Bates stamped Sinha 000002-000003)).

6

14.    On February 25, 2022, Dean Gribb notified Sinha that she wanted to meet with him to discuss the outcome of the chair election but requested that prior to that meeting Sinha send her a detailed list of the personal and professional development work that he had completed to address the documented toxic work environment that existed in the Finance Department while he was Chair. (Sinha Dep. pp. 48 lines 18-24 and p. 49 lines 1-4, and Ex. 6, p. 8 (Bates stamped Sinha 000004) and p. 22 (Bates stamped Sinha 000018)).

15.    Sinha prepared the documentation requested by Dean Gribb. (Sinha Dep. p. 49, lines 3-22 and Ex. 6 pp.10-13 (Bates stamped Sinha 000006-000009)).

16.    On March 4, 2022, Dean Gribb met with Sinha and informed him that she would not ratify the election because the documentation provided by Sinha did not show professional development activities. (Sinha Dep., p. 63, lines 3-16).

### Undisputed Immaterial Facts

3.    On November 9, 2016, the Faculty Grievance Committee at Bradley reported to then President Roberts that due to a negative environment in the Department of Finance and Quantitative Methods, it was recommended that Sinha be replaced as Department Chair. (Sinha Dep. P. 70, lines 4-11 and Ex. 8). Bradley's **UMF 3** is immaterial because the majority of faculty creating a negative environment no longer worked at Bradley, Sinha had worked on his own personal and professional growth to avoid being part of any future negative environment and there is no evidence of a negative or dysfunctional environment at the time of Sinha's 2022 election.

4.    A report of a Title IX Investigation involving Sinha dated March 7, 2017 found a dysfunctional environment in Sinha's Department. (Sinha Dep. p. 69, lines 7-24, and p. 70, line 1, and Ex. 7). See Sinha's response to **UMF 3**.

21.    After the non-ratification of Sinha's election, Dean Gribb began exploring the opportunity to merge the very small Finance Department into the Economics Department and regarded meeting with the Finance Department regarding the non-ratification of the election as moot. (Gribb Dep. p. 28, lines 10-24, p. 29, lines 1-11, p. 31, lines 5-12, p. 34, lines 7-24, and Ex. 13, p. 2 (Bates stamped BU 000103)). Bradley's **UMF 21** is immaterial because what was done with the department post-election is irrelevant to Sinha's claims and Bradley's defenses.

22.    Sinha does not contend that any similarly situated Bradley faculty member who was elected as a department chair, having previously been removed as one, was treated more favorably than he was and agrees that his situation is unique. (Sinha Dep. p. 87, lines 14-24, p. 88, lines 1-10). Bradley's **UMF 22** is immaterial because Sinha must establish causation through means not involving a comparator.

23.    Sinha feels the losses he alleges because of not becoming a department chair were "suffered because some people didn't like me." (Sinha Dep. p. 89, lines 11-13) Bradley's **UMF 23** is immaterial because the vague statement could be referencing damages or Sinha was not liked because he sued Bradley.

## Disputed Material Facts

17.    Dean Gribb's conclusion after reviewing Sinha's documentation was that it did not provide evidence that Sinha had worked on developing the leadership skills he would need to be a department chair. (Gribb Dep., 39, lines 14-21). Bradley's **UMF 17** is disputed because Sinha produced such evidence. (Ex. 12, pg. 3)

18.    When asked to identify professional development activity, defined as developing and improving skills such as planning, organization, leadership and management, listed in the documentation he provided to Dean Gribb, Sinha identified only working on relationships between Bradley and third parties and working on accreditation matters. (Sinha Dep. p. 62, lines 5-21). Bradley's **UMF 18** is disputed. Gribb never defined the term as referenced above. (Gribb Dep. Ex. 3, pg. 18) Gribb could not recall meeting with Sinha over the document so Bradley cannot claim Gribb explained the term. (Gribb Dep. Ex. 3, pg. 30, Sinha Dep. Ex. 7, pg. 48-49, 62, Ex. 12)

19.    The only facts that Sinha contends support a finding that his February 2022 election was not ratified in retaliation for his protected activities are that (a) the refusal to ratify did not comply with Bradley's Faculty Handbook; (b) it is false to say that the documentation he provided to Dean Gribb did not show professional development activities; (c) professional development is not a requirement to serve as a department chair; and (d) Dean Gribb violated the Faculty Handbook by not meeting with Finance Department faculty to inform them of the rationale for her decision not to ratify or instead to hold a special election.

9

(Sinha Dep. pp. 8, lines 12-24, and p. 9, lines 1-6 and Ex. 4). Bradley's UMF 19 is disputed. Both Zakahi and Gribb made statements that Sinha would never be allowed to be chair person long before the post-election toxicity document was requested and then later cited as the only reason for non-ratification. The department was without an elected internal chair for five years without any legitimate reason given to faculty and there is no evidence prior chairs were required to request professional development activities. (Kerr Dep. Ex. 2, pg. 14, Sinha Dep. Ex. 7, pg. 18-19, 21, 23-24, 34-35, 36, 41, 44-45, 48)

20.    The only part of the procedure for electing department chairs that Sinha contends that Dean Gribb did not follow was meeting with the Department to explain the rationale for declining to ratify the election. (Sinha Dep. p. 75, lines 15-23). Bradley's UMF 20 is disputed and material. Bradley never obtained a vote from the Finance Department faculty to seek an external chair. (Ex. 10, Par. A(4)(a)) Gribb refused to allow the faculty genuine responsibility for chair selection. (Exhibit 10, Par. A(1)(a)) Gribb refused to hold a special election after choosing not to ratify Sinha's election. (Ex. 10, Par. A(8)(1)) Gribb and Provost Zakahi were not permitted to intervene in the selection of a chair unless the special election failed to produce a winner. (Ex. 10, Par. A(8)(b)(1)

## Disputed Immaterial Facts

5.    On March 22, 2017, Sinha was removed as Chair of the Finance Department due to reports concerning a toxic environment existing in his department while he was Chair. (Sinha Dep., p. 11, lines 12-21 and Ex. 1; p. 70,

lines 18-24 and Ex. 9, p. 1, ¶ 1; p. 71, lines 1-24 and Ex. 9, pp. 1-4, ¶¶ 3-5, 13 and Facts 3 and 4 above). Bradley's **UMF 5** is disputed immaterial. Sinha was removed as chair in 2017 because of his protected activities of which he did not convince the court. Sinha's claim is based on his protected activities after his 2017 removal. (Case No. 18-cv-1319, Doc.#1, Docket #1)

## Additional Material Facts

### Testimony of Crystal Elliott

1.  Elliott started working at Bradley in January of 2020 and always served as the HR director. (Elliott Dep. Ex. 1, pg. 4)

2.  At the end of '21 going into '22 Sinha came to her office to meet. (Elliott Dep. Ex. 1, pg. 7)

3.  After a short conversation, Elliott followed up with him in an e-mail indicating that she had looked into his concerns and they were going to just follow the faculty handbook. (Elliott Dep. Ex.1, pg. 7-8)

4.  Sinha was concerned about retaliation and making sure that Bradley was following the handbook and the process for hiring a department chair. (Elliott Dep. Ex. 1, pg. 8) Elliott most likely talked with the Provost's office. That seems to be my first place to go about questions concerning processes. They were going to follow the policy, the process in the handbook (Elliott Dep. Ex. 1, pg. 9)

### Testimony of Stephen Kerr

5.  Stephen Kerr served for a time as the Department Chair of the Finance Department. (Kerr Dep. Ex. 2, pg. 9)

11

6.     Kerr was finishing his term the academic year of 2021 as chair of the accounting department. In early summer, late spring 2021, Matt O'Brien approached Kerr to be the acting chair of finance for a year while they found a permanent chair for the department. (Kerr Dep. Ex. 2, pg. 9)

7.     Kerr's goal or objective as Finance Chair was to work towards the department having their own chair. (Kerr Dep. Ex. 2, pg.13)

8.     Kerr did not know why the Finance Department had had four years of being without a permanent chair and being able to elect one. That seemed unusual. (Kerr Dep. Ex. 2, pg. 14)

9.     Kerr's mandate coming in was to hire a new faculty member who could be department chair. Kerr did not know why an outside faculty member would come in as Chair rather than electing a Chair within the Department. Kerr had no reason to question Walter (Zakhai) on that. (Kerr Dep. Ex. 2, pg. 16)

10.     Kerr interacted with Sinha weekly at least maybe three times a month at department meetings for an hour, chitchat in the hallway. So nothing particularly intense but, a normal collegial chat. (Kerr Dep. Ex. 2, pg. 16)

11.     Kerr did not receive any complaints from any of the faculty or students about Sinha. (Kerr Dep. Ex. 2, pg. 21-22)

12.     During Kerr's time as chair, he said Sinha was eligible to serve as Chair. Sinha was a very robust scholar and is quite good at his scholarship. (Kerr Dep. Ex. 2, pg. 23)

13.    As for the impact on the faculty members on hiring an outside chair and them not being able to vote on it, Kerr said that was the direction that the Provost had taken in the department. (Kerr Dep. Ex. 2, pg. 24)

14.    When hiring an outside Chair came up in department discussions because the Finance faculty would have selected their own chair, Kerr told them what is done is done…. there is a search underway to do this….there's no point in talking about something that – a decision's been made. (Kerr Dep. Ex. 2, pg. 24)

15.    Kerr was chair when the decision was made to stop seeking an outside chair. Kerr was under the impression that Gribb felt the department didn't have enough students at that point to justify adding a fifth faculty member. So, the search was stopped. (Kerr Dep. Ex. 2, pg. 24-25)

16.    Kerr heard of occasions when an election is not ratified by a Dean or Provost. It's rare but it's not unheard of. (Kerr Dep. Ex. 2, pg. 27)

17.    After Sinha was elected, he was not ratified. (Kerr Dep. Ex. 2, pg. 29)

18.    Kerr recalled in January or early 2022 having a conversation with Sinha and Crystal Elliott about Sinha's interactions with Molly Gribb over the election. (Kerr Dep. Ex. 2, pg. 28-29)

### Testimony of Molly Gribb

19.    Gribb was employed with Bradley January 17th, 2022 to August 1st, 2023 serving as the Dean of the College of Engineering and the Dean of the Foster College of Business. (Gribb Dep. Ex. 3, pg. 6)

20. Walter Zakahi was the Provost at the time Gribb was Dean. (Gribb Dep. Ex. 3, pg. 6)

21. Gribb was responsible for all of the personnel, all of the facilities, academic programming. It's like being a CEO. (Gribb Dep. Ex. 3, pg. 8)

22. While Gribb was Dean, the Associate Dean for the Foster College of Business was Paul Stephens and Matt O'Brien was the interim Dean prior to Gribb coming on board in January. (Gribb Dep. Ex. 3, pg. 9)

23. When Gribb arrived she claimed she was informed of what they were doing to begin the external search for an outside Finance Chair. Gribb claimed that it became clear that they weren't following the faculty handbook and that they needed to do that. (Gribb Dep. Ex. 3, pg. 11)

24. In late January Gribb claimed she reviewed internal documents about a grievance that had occurred when Sinha was Finance Chair. She received them through the Provost's office. (Gribb Dep. Ex. 3, pg. 12)

25. As for whether the Provost ever talked to Gribb about Sinha and his prior election as Chair or the upcoming election as Chair, Gribb said after the election they discussed it. Gribb said she did not recall many of the details. (Gribb Dep. Ex. 3, pg. 13)

26. Gribb could not recall whether at the time of the election she had any idea what the Provost's feelings were about Sinha becoming the Department Chair. (Gribb Dep. Ex. 3, pg. 14)

14

27.    Gribb claimed that after reading the materials she had some concerns about the Department and about Sinha's potential leadership skills.   Gribb could not recall having a discussion with any members of the Finance Department about the climate of the Department. (Gribb Dep. Ex. 3, pg. 15-16).

28.    Gribb did not do any type of inquiry or investigation as to whether or not there had been grievances filed amongst the faculty after the one that was reduce to writing in 2017. (Gribb Dep. Ex. 3, pg. 16)

29.    Gribb claims she was concerned about the climate of toxicity within the Department but did not recall talking to any faculty members, Stephen Kerr or Matt O'Brien about this climate of toxicity that was claimed to have existed within the Department. (Gribb Dep. Ex. 3, pg. 16-17)

30.    Gribb could not recall talking with Sinha about her concerns prior to the election but recalls a meeting with him prior to the election. Gribb claims she did not recall the specifics of that discussion only that it occurred about a week and a half after she started her job. Gribb claims she recalled that was the only meeting she had with Sinha. (Gribb Dep. Ex. 3, pg. 17-18)

31.    Gribb did not remember talking to anyone about Sinha's ability to successfully serve as Chair before the election. (Gribb Dep. Ex. 3, pg. 18.)

32.    After the election, Gribb asked Sinha to provide some written documentation about professional development he may have taken to prepare himself to successfully lead the Department. (Gribb Dep. Ex. 3, pg. 18)

15

33.    Gribb asked Sinha to develop this written document even though she had told him, prior to the election, she was not going to ratify the election. (Gribb Dep. Ex. 3, pg. 19)

34.    The 2017 grievance and potential climate of toxicity was based on how all these faculty members treated each other which was a factor to Gribb. (Gribb Dep. Ex. 3, pg. 19)

35.    Gribb did not know whether Bradley ever undertook any efforts after the grievance report to train or teach the faculty members how not to be toxic to each other. (Gribb Dep. Ex. 3, pg. 20-21)

36.    Gribb claimed the Provost played no role whatsoever in the decision not to ratify the election of Sinha or that Matt O'Brien had recommended Sinha serve as the Department Chair. (Gribb Dep. Ex. 3, pg. 20-21)

37.    During the meeting with Sinha in January of 2022, Gribb could not recall whether or not she mentioned to Sinha that he was obstructing the process. Gribb couldn't recall saying that if she followed the process of the Chair selection and Sinha were to be elected, under no circumstances would she ratify his election. (Gribb Dep. Ex. 3, pg. 21-22)

38.    Gribb said the 2022 election Sinha won unanimously did not show something about a lack of toxicity within the Department because it could mean people were afraid to vote otherwise. (Gribb Dep. Ex. 3, pg. 23-24)

39.    Gribb claimed Tong was concerned about how the senior faculty might respond to his vote. (Gribb Dep. Ex. 3, pg. 24-25)

16

40.    Gribb claimed Professor Tong was concerned about the senior faculty and how they would treat him if he didn't go along with Sinha's election. Gribb had no information, whether in writing or from talking to anyone, that Sinha had ever intimidated anyone in the prior election or the one in 2022. (Gribb Dep. Ex. 3, pg. 25)

41.    Gribb said she asked Sinha to prepare a document listing certain of his activities, which he did. Gribb could not recall meeting with him about the document and had no interactions with him about the document. (Gribb Dep. Ex. 3, pg. 30)

42.    Gribb recalled not ratifying an election in another department. Professor Tempe's interactions with Gribb were adversarial and he was not very cooperative. (Gribb Dep. Ex. 3, pg. 32) There were ten or 12 faculty members in Tempe's Department. (Gribb Dep. Ex. 3, pg. 33)

43.    Gribb could not remember the breakdown of the vote for Tempe only that she met with the entire Department after the election and told them why she didn't ratify the election. Gribb did not meet with the Finance Department after the election or tell them why she did not ratify Sinha's election. (Gribb Dep. Ex. 3, pg. 33-34)

44.    The faculty handbook required Gribb to disclose to the Department why she did not ratify Sinha's election. (Gribb Dep. Ex. 3, pg. 34)

45.    Gribb determined that the election issue was moot, such that the handbook provision was irrelevant. (Gribb Dep. Ex. 3, pg. 35)

46.    Tempe did not have the leadership and administrative qualities necessary to succeed. (Gribb Dep. Ex. 3, pg. 37-38)

47.    Gribb didn't recall a meeting with the President to discuss Sinha. (Gribb Dep. Ex. 3, pg. 39)

48.    Gribb claimed Sinha's assignment to her on removing toxicity did not have any evidence in that document that he had worked on developing the leadership skills he would need to be a Department Chair. Gribb did not know what training was available to Department Chairs or whether outside training was available to Sinha after 2017. (Gribb Dep. Ex. 3, pg. 39-40)

### Testimony of Walter Zakahi

49.    In 2020 Matt O'Brien nominated Sinha for one of the finance department's chaired professorships. (Zakahi Dep. Ex. 4, pg. 6)

50.    Zakhai could not remember any conversations with Matt O'Brien about Sinha becoming chair of the finance department. (Zakahi Dep. Ex. 4, pg. 7)

51.    Zakhai recalled that he was elected chair and that Dean Gribb did not ratify him as chair but had no memory of any discussions with her about ratification -- or, non-ratification of the election. (Zakahi Dep. Ex. 4, pg. 7)

52.    Zakahi had no recollection of telling O'Brien that as long as he were provost Sinha was not going to be the department chair. (Zakahi Dep. Ex. 4, pg. 7)

53.    Zakahi claimed he did have concerns about Sinha being department chair given the previous experience that the department had with him as department chair because of the toxicity that occurred within the department, the

apparent lack of leadership in the department, and the fact that Zakahi had two different investigations telling him that Sinha should be removed as department chair. (Zakahi Dep. Ex. 4, pg. 8)

54.   Zakahi had no recollection of O'Brien or any other individual communicating that this toxicity in the department existed long before Sinha. (Zakahi Dep. Ex. 4, pg. 8)

55.   Zakahi had no memory of any conversations with Gribb about Sinha's election. (Zakahi Dep. Ex. 4, pg. 9)

56.   Zakahi recalled that was some other people were involved in the election process but did not remember specifically who they were. (Zakahi Dep. Ex. 4, pg. 11)

57.   Zakahi said the election occurred shortly after Gribb came to Bradley and as to whether he ever had a discussion with her about Sinha's pre 2020 removal as chair, Zakahi said he sent her reports from the Title IX investigation and from human resources. (Zakahi Dep. Ex. 4, pg. 12-13)

58.   Zakahi claimed he had no role in not ratifying the election, Gribb was the sole decision maker. (Zakahi Dep. Ex. 4, pg. 13)

59.   Zakahi agreed there had only been a couple of instances where an election was not ratified and the decision may have been discussed with him but he did not remember. Zakahi would have expected the dean to discuss such a decision with him beforehand but he had no recollection. (Zakahi Dep. Ex. 4, pg. 14-15)

19

60. Zakahi said he did not remember or recall whether O'Brien supported Sinha being the chair of the finance department. (Zakahi Dep. Ex. 4, pg. 17-18)

## Testimony of Paul Stephens

61. Paul Stephens is the associate dean. (Stephens Dep. Ex. 5, pg. 5)

62. Matt O'Brien was at the interim dean at the time. (Stephens Dep. Ex. 5, pg. 6)

63. In the beginning of 2022, Stephens was told there was going to be a vacancy in the chair position of Sinha's department, probably by Dean Gribb who asked him to run the election occurring probably in February. (Stephens Dep. Ex. 5, pg. 13)

64. Stephens did not believe he would have informed Horvath and Sinha the Dean and the Provost would not ratify the election. (Stephens Dep. Ex. 5, pg. 16)

65. Sinha won the Chair election. (Stephens Dep. Ex. 5, pg. 20)

66. As far as conversations, the thrust of it was that Gribb told Sinha that she wouldn't approve the election. Gribb had not informed Stephens. Gribb would have had to have said why, but she didn't tell Stephens and he did not remember if Gribb provided a reason in the meeting with Sinha and Gribb. (Stephens Dep. Ex. 5, pg. 21)

67. Stephens was a bit surprised about the decision not to ratify Sinha's election. (Stephens Dep. Ex. 5, pg. 22)

20

68.    Stephens told Sinha and Professor Horvath what his role was in the (election) process, and at a certain point in the process, his responsibilities end and then it's handed off to the dean and the provost and Stephens had no control over that.(Stephens Dep. Ex. 5, pg. 23)

69.    Stephens' position to the Department members was that he would urge the Dean to ratify the election whoever got elected. (Stephens Dep. Ex. 5, pg. 23-24)

70.    Stephens was aware, having been in the college for a long time, that there were problems in the finance department before Amit was in the department and that obviously there were some problems because there was a series of people from outside the department assigned as chairs of the department. Stephens didn't know anything about what was actually going on and he didn't think it was any of his business. (Stephens Dep. Ex. 5, pg. 24)

71.    As of the time of the election in 2022, Stephens was not aware of any, whether true or not, perceived problems that Sinha was causing within the finance department; none of the faculty members tenured or not complained to him about Sinha in 2022. (Stephens Dep. Ex. 5, pg. 24-25)

72.    Stephens denied telling Sinha after this department meeting in February of 2022 that it had taken years to correct the wrong done to him. (Stephens Dep. Ex. 5, pg. 24-25)

73.    Stephens did not recall expressing at the meeting with Gribb and Amit that the problems that had existed in the finance department were not Amit's creation though he was aware having been in the college for so long that there were

problems that had preceded Amit even being in the college. (Stephens Dep. Ex. 5, pg. 27)

### Testimony of Matthew O'Brien

74.    Matthew O'Brien oversaw hiring and matriculation, onboarding of new faculty members and making appeals to the Provost about needs for staffing either as faculty members or staff members. (O'Brien Dep. Ex. 6, pg. 6)

75.    O'Brien nominated Sinha to one of the chaired professorships. (O'Brien Dep. Ex. 6, pg. 10)

76.    O'Brien informally had a conversation with the Provost saying these underutilized resources should be dedicated to people in kind of the discipline, and here are the people in the discipline. Professor Sinha was one of them. (O'Brien Dep. Ex. 6, pg. 10-11)

77.    O'Brien talked to the Provost about having Sinha fill the Stevenson professorship or the other one. (O'Brien Dep. Ex. 6, pg. 11)

78.    O'Brien couldn't recall whether Provost supported Sinha being given the professorship. (O'Brien Dep. Ex. 6, pg. 11-12)

79.    O'Brien's interim dean tenure started February 1 of 2018 and finished in January 15th-ish of 2022. (O'Brien Dep. Ex. 6, pg. 13-14)

80.    O'Brien had discussions with the Provost about the finance department chair on a number of occasions, three or four or five occasions, by offering options to get back to that model of faculty governance in the finance department. (O'Brien Dep. Ex. 6, pg. 14)

81. O'Brien advised the Provost that Sinha was interested in becoming department chair. (O'Brien Dep. Ex. 6, pg. 18)

82. Sinha was qualified to be a department chair. (O'Brien Dep. Ex. 6, pg. 18)

83. During the four-year period as interim Dean, O'Brien did not recall any problems with in-fighting amongst the finance department members and that the faculty got along with one another adequately. (O'Brien Dep. Ex. 6, pg. 19)

84. O'Brien discussed with the Provost Sinha's qualifications for Chair position. (O'Brien Dep. Ex. 6, pg. 19-20)

85. O'Brien was aware that Sinha had sued Bradley. (O'Brien Dep. Ex. 6, pg. 20)

86. O'Brien denied telling Sinha that as long as Zakahi was Provost Sinha was not going to be department chair. (O'Brien Dep. Ex. 6, pg. 20)

87. O'Brien relayed to Sinha that he had offered and advocated for somebody in the department to be department chair and Sinha was certainly among that list of people O'Brien felt would have been appropriate but after O'Brien had laid out options for self-governance to the Provost, at some point he, the Provost, came back and said let's look for another external department chair to appoint to that department. (O'Brien Dep. Ex. 6, pg. 20-21)

88. O'Brien did not believe he told Sinha that if he had the ability, he would appoint Sinha as Chair. (O'Brien Dep. Ex. 6, pg. 21)

23

89.   O'Brien said he never learned the reasons why the Provost was not going to allow an election. (O'Brien Dep. Ex. 6, pg. 21-22)

90.   O'Brien did not believe he would have not ratified anybody who was elected. (O'Brien Dep. Ex. 6, pg. 22)

91.   O'Brien had no reason to believe Sinha was not suitable to be department chair but did not recall the Provost using words about Sinha to the effect of no, no, not him. (O'Brien Dep. Ex. 6, pg. 23)

92.   Sinha expressed an interest in becoming the associate dean and was qualified to be an associate dean. (O'Brien Dep. Ex. 6, pg. 26, 28)

93.   O'Brien hired Sinha to be a coordinator which did not require Provost or presidential approval. (O'Brien Dep. Ex. 6, pg. 29)

### Testimony of Amit Sinha

94.   Because of the hostility that was coming from the Provost's office, Sinha was not confident that O'Brien's recommendations would go through. So Sinha thought he would document it so he would remember the conversation. (Sinha Dep. Ex. 7, pg. 10) (Sinha's contemporaneous notes of events and conversations, Ex. 11)

95.   On March 25, 2021, Professor Robin, who was serving as the associate dean, was hired to be the Dean at Southern Connecticut State University. That position had opened up, and Sinha was desirous of being considered for it. Sinha had asked O'Brien to consider him for that position, and O'Brien said that he couldn't put Sinha in that position because it would not go well with the upper

24

administration and Sinha asked him why. O'Brien didn't specifically respond to Sinha's question but he said if he could he would put Sinha in as the chair for the finance department. (Sinha Dep, Ex. 7, pg. 18-19)

96. Sinha documented O'Brien's statement that if he could have he would have appointed Sinha as department chair which is obviously different than associate dean. Appointment as associate dean was not acceptable but if O'Brien could he would appoint Sinha as the department chair. After meeting with Zakahi over succession planning, O'Brien concluded as long as Zakahi was Provost, Sinha would not be chair. (Sinha Dep, Ex. 7, pg. 17, 20, Ex. 11)

97. Sinha's chronology noted O'Brien would recommend the hiring of a new department chair on April 1, 2021. Sinha understood O'Brien would make the recommendation on April 1. Sinha then recorded under the March 31 entry that after the meeting, Sinha went and told O'Brien not to exclude him from consideration as department chair because Sinha wanted to be absolutely sure that O'Brien knew that Sinha was still interested in being department chair. (Sinha Dep, Ex. 7, pg. 20-21)

98. O'Brien told Sinha that Zakahi's response was that O'Brien's recommendation cannot happen at this point. (Sinha Dep, Ex. 7, pg. 21)

99. The steps that were taken regarding an external chair was O'Brien made a request to fill a position to the Provost's office which was approved sometime later on. Sinha did not remember exactly the chronology on when that

official request was made, there was no placement for jobs made on any professional websites in April of 2021. (Sinha Dep, Ex. 7, pg. 22-23)

100.    Sinha said at that point he thought O'Brien was feeling a little frustrated continuing as the chair for the finance department and also as the dean where his position was also going to be ending.  O'Brien mentioned he wanted to have that issue resolved before the new dean came in. (Sinha Dep, Ex. 7, pg. 23)

101.    O'Brien told Sinha that he would be his number one candidate to be the chair of the department but they won't allow O'Brien to do that. (Sinha Dep, Ex. 7, pg. 23)

102.    As for whether there was anything happening at that time that would lead to either a new internal or a new external chair for your department, Sinha must have asked him what's going on with the chair in the department --for the department.  So when O'Brien said that, well, you would be the number one candidate but they won't allow me, that showed a pattern as to why Sinha was not going to be the chair. (Sinha Dep. Ex. 7, pg. 24)

103.    Sinha stated to O'Brien on April 30, 2021, now that Bradley won, what is the plan for the department. Sinha told O'Brien that he lost his appeal and that – now that Bradley had won – and won here refers to losing the petition at the 7th Circuit Court of Appeals. So there has to be some plan of what has to be – what course of action Bradley was going to take, and O'Brien was serving as the dean. That's why Sinha had gone and asked him about it. (Sinha Dep. Ex. 7, pg. 25)

26

104. On April 30, 2021, O'Brien said to Sinha that he was having conversations with the Provost. O'Brien said he had advocated for Sinha and conveyed that Sinha is ready (to be Finance Chair) and has the department behind him. (Sinha Dep. Ex. 7, pg. 28)

105. In April 2021, O'Brien was going to leave that position and he was trying to get things cleaned up for his successor and for the chair successor, O'Brien was referring to looking at people within Foster College who could act as interim chair. (Sinha Dep. Ex. 7, pg. 30)

106. On May 5th or shortly thereafter, Sinha recorded that O'Brien told him that Stephen Kerr would be the chairperson for the upcoming year. Sinha believed Kerr was an accounting professor and perhaps he was also finishing up his term as the chair for the accounting department. That part Sinha did not remember 100 percent for sure. (Sinha Dep. Ex. 7, pg. 31)

107. On Sinha's May 5th entry in the chronology, he noted he asked O'Brien if the Provost ever gave an explanation in reference to Sinha becoming a chair and the Provost not being interested in that. O'Brien told Sinha the that the only thing he was told was no, no, not him. (Sinha Dep. Ex. 7, pg. 34)

108. Sinha was never given any more details by O'Brien beyond what Sinha documented. (Sinha Dep. Ex. 7, pg. 34)

109. In a rather brief conversation, Sinha told O'Brien that the problem with the department lay with the Provost's office and not with him. O'Brien responded that Zakahi followed through with what Radson wanted and now he has

placed himself in a corner. This has gone on for far too long, and it need not have. The department didn't get to have its say as to who would be the leader for the department. (Sinha Dep. Ex. 7, pg. 35)

110.  During the week of May 10 to 14, it was finals week. Sinha had a conversation with Kerr about the problem with the finance department does not lie within the department. Sinha told Kerr they were professors, and opinionated professors can differ in their opinion but they were able work with each other in spite of their opinions, but they didn't get to have a say in who would be the leader of the department. (Sinha Dep. Ex. 7, pg. 36)

111.  During the May 10-14, 2021 conversation, when Sinha had said that the problem within – with the finance department does not lie with the department, Kerr indicated that the problem was with the Provost's office, not with the department. (Sinha Dep. Ex. 7, pg. 36)

112.  On June 10, 2021, Kerr told Sinha that a request to hire an external department chair was filed with the Provost at the end of May. Kerr would have filled out the forms and passed them on to O'Brien, and O'Brien must have forwarded it to the Provost's office. (Sinha Dep. Ex. 7, pg. 37)

113.  In June 2021, it was obvious that the Provost wasn't going to let the finance department elect its own chair. (Sinha Dep. Ex. 7, pg. 37)

114.  There was no vote by the Finance Department faculty requesting the appointment of an outside chair. (Sinha Dep. Ex. 7, pg. 38)

28

115.   On June 10, 2021, when Sinha was told by Kerr that a request for an external department chair had been filed, Sinha did not indicate whether he was in favor or opposed to that.  Sinha was reconciled that he wasn't going to be the chair even though he had wanted to be but it wasn't going to happen.  If they wanted to do this, Sinha did not have to be in favor of it.  They would have done it anyway. (Sinha Dep. Ex. 7, pg. 38)

116.   Sinha was not in favor of an external hire. (Sinha Dep. Ex. 7, pg. 38)

117.   In June 2021 to January 2022, Kerr would have come to Sinha and told him about it (external chair search) and may even asked Sinha if he wanted to be a member of the search committee. Sinha believes he told Kerr that he intended to apply for the Chair position so he couldn't be on the search committee. (Sinha Dep. Ex. 7, pg. 39)

118.   Before January of 2022, Gribb was not a Bradley employee. (Sinha Dep. Ex. 7, pg. 40-41)

119.   Gribb told Sinha he was obstructing the process. He was obstructing the process for the external search when Sinha was insisting on following the handbook process which entailed the department voting in favor of an outside search. (Sinha Dep. Ex. 7, pg. 41)

120.   On January 27, 2022 a meeting with Gribb took place in Sinha's office starting around 1:50 p.m.. Sinha documented the meeting because much of the conversation bothered him tremendously.  Sinha was shaken and tried to be as objective in his documentation as he could be. There were comments like when

29

Gribb had come into Sinha's office and Sinha was having lunch and she said, oh, I'm sorry. I'm interrupting your lunch. Sinha said, don't bother. There were some plants in Sinha's office that had died, and she commented about those. Sinha didn't think those comments were relevant so he didn't document those. (Sinha Dep, Ex. 7, pg. 43, Ex. 11)

121.    On January 28, 2022, Sinha briefed Kerr and Crystal Elliott about the January 27, 2022 conversation with Gribb. Elliott was the director for human resources or its equivalent. That is why Sinha thought Elliott should know that Gribb's conversation had bothered him quite a bit. Why would Gribb even come and tell Sinha he was obstructing the process where his e-mail was only asking her to follow the handbook procedure. Sinha felt that Gribb was kind of rude towards him, why would she keep interrupting him, why was she telling Sinha that he was being difficult. Those are not normal conversations to be had in an academic employment, especially hearing that from the boss. The other thing that bothered Sinha about the conversation was that it kind of established Gribb's predisposition towards him. Sinha felt that she was going to have a negative attitude towards him and that would not call for a good work environment. (Sinha Dep. Ex. 7, pg. 44-45)

122.    In briefing Kerr, Sinha had tried to summarize that conversation and he believed Kerr said it is unfortunate that that conversation happened. (Sinha Dep. Ex. 7, pg. 45)

123.    On February 1, 2022, Elliott mailed to Sinha that the handbook procedure would be followed in the chair election. (Sinha Dep. Ex. 7, pg. 46)

30

124.    Sinha sent an e-mail to the president requesting a meeting. Stephens stopped by Dr. Phil Horvath's office to tell him they would follow the handbook procedure, which meant that the dean would call for an election, the recording secretary would be elected and call for nominations.  The nominations would be finalized and the work for the chair election would happen. And once the election process comes, the recording secretary would inform the dean who the winner of the election was, and then the certification would come from the dean's office. (Sinha Dep. Ex. 7, pg. 46-47)

125.    Sinha was recording pretty regularly events that were happening in connection with the department chair election in the finance department. (Sinha Dep. Ex. 7, pg. 47, Ex. 11)

126.    On Sinha's February 14, 2022 entry, Stephens said he did not know what everything Darrell Radson said to whom that led to the situation in the department.  Sinha understood that to mean the department didn't have a chair, Sinha was removed as the department chair and the events leading to Sinha's removal. (Sinha Dep. Ex. 7, pg. 48)

127.    On February 25, 2022, after Sinha won the election, Sinha got an e-mail from Gribb requesting a meeting to discuss his election and to prepare a document listing personal and professional activities undertaken to address toxicity in the department. Sinha prepared a document and sent it to Gribb on February 28, 2022. (Sinha Dep, Ex. 7, pg. 48-49, Ex. 12)

128.    Sinha's document stated that at that point in time, there was no toxicity. There were difference of opinions for sure and as faculty are opinionated and Sinha would not know if those should be construed as toxicity. (Sinha Dep. Ex. 7, pg. 50)

129.    In Sinha's second bullet point to Gribb he was communicating that if the situation was as bad as people made it to be, Peplow (HR Director) would have recommended that Sinha be moved as department chair, but even after the investigation that she had carried out, she didn't make that recommendation. (Sinha Dep. Ex. 7, pg. 51, Ex. 12)

130.    Sinha listed statements from colleagues: Webster on August 29, 2018; Showers on August 2nd, 2016; Horvath on August 22nd, 2018; then going to the next page Amy Fairfield November 24, 2020. Sinha said people had nice things to say about him. (Sinha Dep. Ex. 7, pg. 51-52, Ex. 12)

131.    When Sinha was the chair, Fairfield was serving as his department secretary. Sinha nominated her to be recognized for the Foster College staff appreciation award in December 2021. Sinha noted that his relationship was such that he was asked to be a pallbearer at her funeral. (Sinha Dep. Ex. 7, pg. 53)

132.    Sinha's document noted the dean said he laughed too much and he was nominated for an award for professional excellence. (Sinha Dep. Ex. 7, pg. 54, Ex. 12)

133.    In communicating to Gribb a listing of accomplishments and activities, Sinha wanted to show that he was a contributing member of the department and had the best interest of people in mind when he was doing stuff. So in terms of

32

toxicity, people were being nice to Sinha and there are some examples where Sinha was nice to others.  So this kind of continues with that perception that Sinha had that people are people and sometimes there could be a difference of opinion.  That doesn't necessarily mean they are bad people. (Sinha Dep. Ex. 7, pg. 55, Ex. 12)

134.    Sinha's list of accomplishments and activities listing was a rebuttal to the idea that there was a toxic environment or that he was contributing to a toxic environment. Sinha was just documenting things that he felt that were relevant. People, when those kinds of things (2017 removal as chair) happen, can end up being very, very bitter, but Sinha was surprised to find himself actually turning out to be more empathetic towards people.  Sinha did not know what heading he would have put that in, and thought he had grown as a human being.  So, he put it under personal development. (Sinha Dep. Ex. 7, pg. 55-56, Ex. 12)

135.    In Sinha's toxicity statement, the first point he made was getting a better understanding of his emotions. He read many different books on past life regression hypnosis and conducted a self-hypnosis -- and conducted self-hypnosis meditation sessions. (Sinha Dep. Ex. 7, pg. 56, Ex. 12)

136.  Sinha said the literature shows that if you are aware of -- or if you become aware of near death experience, you tend to become more empathetic. And the signal that he was trying to give is that these experiences had made me -- not that I was a toxic individual before but reading through this literature has made me even more empathetic than I was before going through being fired as a department chair. (Sinha Dep. Ex. 7, pg. 58)

137.    Sinha's toxicity statement listed the Ho'oponopono meditation which means make it right, and it has four sentences.  So whoever makes you angry you can just imagine that individual and say I'm sorry.  Please forgive me.  I thank you, and I love you. And you can just keep saying that until the bitterness that you might have towards that individual just goes away. (Sinha Dep. Ex. 7, pg. 59, Ex. 12)

138.    Sinha's point was that those things can make you even more an empathetic person.  And because he had done those things, Sinha believed he was even more empathetic than he was before, and felt that given that this is a documentation for addressing toxicity, he felt it was important to mention those things. (Sinha Dep. Ex. 7, pg. 59)

139.    Taking that course made Sinha a better human being and also made him a better professor. That is how he would explain that it has been part of his personal development. And that was how the training was set up, so how do you react.  So if you react very negatively and lose control of the situation, certainly then, you know, there's more for you to lose. So having gone through that seminar, Sinha believed that sometimes, dealing with opinionated professors can be stressful and that training would help him handle that situation a little better. (Sinha Dep. Ex. 7, pg. 61-62, Ex. 12)

140.    Sinha's document to Gribb dealt with developing and improving professional skills such as planning and organization, leadership and management. Sinha's list, in part, included serving as the department liaison with Caterpillar. Sinha helped build a relationship with Morgan Stanley through Ms. Kay Berg that

34

has resulted in people getting internships and subsequent to that jobs there. Sinha had also conducted a seminar at Bradley about AACSB accreditation. O'Brien and Jennifer Robin appointed me as the AACSB coordinator and Sinha had attended some seminars conducted through the AACSB. (Sinha Dep. Ex. 7, pg. 62, Ex. 12)

141. On March 4, 2022, in the presence of Interim Dean Paul Stephens, Gribb informed Sinha she would not ratify the election. The reason she provided was there was no professional development activities in the write-up that Sinha had provided. That was the only reason she had provided. (Sinha Dep. Ex. 7, pg. 63, Sinha's contemporaneous notes, Ex. 11)

142. In the lawsuit in 2017, it came out Zakahi was the one who had made the decision to remove Sinha as the chair. And through the conversations that Sinha had with Matt O'Brien, it didn't appear he would get a favorable hearing from Zakahi if Sinha brought this issue up with him. (Sinha Dep. Ex. 7, pg. 66-67)

143. Sinha pointed out to Gribb, O'Brien was already well aware, that the department had to vote to hire an outside chair before a search was even undertaken. (Sinha Dep. Ex. 7, pg. 68, Ex. 10)

144. Stephen Standifird, President did not respond to Sinha's emails so a meeting was not set up. (Sinha Dep. Ex. 7, pg. 69)

145. If the dean does not approve the ratification of the election, the dean has to explain to the department why that ratification did not happen. Gribb did not do that. (Sinha Dep. Ex. 7, pg. 75)

35

146.    Sinha was intending, if there was an outside search at Bradley for a department chair for Sinha's department, he would apply for the position. (Sinha Dep. Ex. 7, pg. 98)

### Testimony of Erin Kastberg

147.    On February 4, 2022, Sinha emailed counsel for Bradley, Erin Kastberg. Sinha wanted clarification from her since she was involved in the legal issues arising out of Sinha's 2017 removal as chair. Sinha told her since he lost his appeal, he was hoping that he could get a fresh start, especially with getting a new dean. Sinha didn't think that would be the case because of his January 27, 2022 conversation with Gribb. Sinha told Kastberg that Gribb told him she had heard and read about why Sinha was removed as Department Chair. If somehow Sinha would be elected as chair, Gribb would not ratify his election. (Kastberg Dep. Ex. 8, Exhibit 14)

148.    Sinha asked Kastberg if his removal as chair (subsequent lawsuits) was a permanent career path death sentence for him at Bradley. (Kastberg Dep. Ex. 8, Exhibit 14)

149.    Kastberg responded to Sinha on February 7, 2022, telling Sinha that the past incidents did not mean he could never serve as chair but he needed to rebuild trust within the department and that the facts determined through the investigations five years prior and lawsuit were relevant and could be properly weighed by the dean. (Kastberg Dep. Ex. 8, Exhibit 14)

150. Kastberg told Sinha rebuilding trust takes time and suggested he undertake some personal and professional development opportunities. (Kastberg Dep. Ex. 8, Exhibit 14)

151. In reference to Kastberg's statement about "facts" were learned through the lawsuit, she was not aware of some kind of dirt that came out that would hamper Sinha's ability to be Chair. (Kastberg Dep. Ex. 8, pg. 7)

### November 5, 2019 Testimony of Walter Zakahi

152. On November 5, 2019, Zakahi testified that it was his idea to remove Sinha as chair. (Zakahi November 5, 2019 Dep. Ex. 9, pg. 31)

153. On November 5, 2019, Zakahi testified that it was his sole decision to remove Sinha as chair. (Zakahi November 5, 2019 Dep. Ex. 9, pg. 32)

### Procedures

154. Department Chair elections are governed by the Faculty Handbook. (Procedures, Ex. 10)

### Contemporaneous Notes

155. Sinha recorded statements made by his superiors about Zakahi and Gribb's animus against him and the faculty election. (Sinha's contemporaneous notes, Ex. 11)

### Standard

Bradley can only be successful on its Motion for Summary Judgment if it can show that no reasonable jury could return a verdict for Sinha. See, e.g., *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022). Therefore, in reviewing

37

Bradley's Motion, the Court must view the record in the light most favorable to Sinha and draw all reasonable inferences in Sinha's favor. *Id.* The Court may not make credibility determinations or weigh the evidence; its only task is to determine "whether there is any material dispute of fact that requires a trial." *Id.*

To return a verdict for Sinha, a factfinder would need to find: (1) Sinha engaged in protected activity; (2) Bradley took a materially adverse action against Sinha; and (3) there was a but-for causal connection between the two. See, e.g., *Alley v. Penguin Random House*, 62 F.4th 358, 365 (7th Cir. 2023). Bradley admits that Sinha can satisfy the first two elements. As a result, Bradley's Motion turns on whether Bradley can show that, even when viewing the record in the light most favorable to Sinha and drawing all reasonable inferences in his favor, no reasonable jury could find but-for causation between Sinha's protected activity and Bradley's failure to promote Sinha.

But-for causation "does not mean that the protected activity must have been the only cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity." *Xiong v. Bd. of Regents of Univ. of Wisconsin Sys.*, 62 F.4th 350, 355 (7th Cir. 2023). "If an adverse employment action is the result of two different causes—one prohibited by Title VII and the other permissible—then summary judgment should not be granted to an employer" because "[i]t is up to the jury, not a court at summary judgment, to unravel the competing, and perhaps intertwined, narratives." *Id.* Stated another way, the fact that Bradley may be able to produce evidence of a lawful reason, if controverted by

38

Sinha, just creates an issue of fact regarding what was the true cause. See *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 643 (7th Cir. 2002).

Sinha may show but-for causation using circumstantial evidence including but not limited to: "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Alley v. Penguin Random House*, 62 F.4th 358, 361 (7th Cir. 2023). Still, ultimately, the evidence is viewed as a whole to determine whether a reasonable jury could draw an inference of retaliation. *Id.*; see also *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936 (7th Cir. 2022).

<u>Argument</u>

The Court must deny Bradley's Motion for Summary Judgment. When viewing the record in the light most favorable to Sinha and drawing all reasonable inferences in his favor, a reasonable jury could find but-for causation between Sinha's protected activity[1] and Bradley's failure to promote Sinha. There is evidence of ambiguous statements of animus towards Sinha and pretext that create an issue of fact regarding the true cause of Bradley's failure to promote Sinha.

I.    **Ambiguous Statements of Animus.**

When viewing the record in the light most favorable to Sinha and drawing all reasonable inferences in his favor, a reasonable jury could find but-for causation between Sinha's protected activity and Bradley's failure to promote Sinha because

---

[1] Both of the Counts in Sinha's Complaint stem from the same lawsuit. As mentioned by Bradley, proving these two Counts involve the same standard. As a result, like Bradley, Sinha will discuss them contemporaneously.

the record contains "ambiguous statements" that the jury could infer show Gribb had retaliatory animus. The "ambiguous statements," which are in bold for emphasis, inferences, and facts leading to those inferences are as follows:

First, the conditions were ripe for discrimination. There were no objective standards whatsoever for what Bradley considered when looking for a department chair; Bradley simply looked for someone who can competently perform the role. This vague description is wholly subjective. The Seventh Circuit has recognized that the total lack of objective standards is highly susceptible to abuse and, at times, can violate Title VII. See *Stewart v. Gen. Motors Corp.*, 542 F.2d 445, 451–52 (7th Cir. 1976) (finding the total lack of objective standards "only reinforce the prejudices, unconscious or not, which Congress in Title VII sought to eradicate as a basis for employment" and "affirm[ing] the district court's holding that defendant's promotional practices with respect to salaried positions violate[d] Title VII"); *E.E.O.C. v. Sears, Roebuck & Co.*, 839 F.2d 302, 331–32 (7th Cir. 1988) (noting that, in determining whether there is so much subjectivity as to engage in a discriminatory practice, the Court must consider "an employer's use of subjective criteria . . . with the other facts and circumstances of the case"); *Hernandez v. City Wide Insulation of Madison, Inc.*, 508 F. Supp. 2d 682, 698 (E.D. Wis. 2007) (finding the Court cannot preclude an inference of retaliatory motive in part because of hesitation due to the defendant's use of a complex, subjective test).

Second, Zakahi was a main player in Sinha's protected conduct. Zakahi removed Sinha from his position as Finance Chair in 2017, which was the adverse

40

action at the center of Sinha's lawsuit. On April 30, 2021, Sinha asked O'Brien to discuss the plan for the department, now that Sinha lost his lawsuit against Bradley. O'Brien responded that he had advocated for Sinha by conveying to Zakahi that Sinha is ready (to be Finance Chair) and has the department behind him.[2] Even though the department was behind Sinha, Zakahi told O'Brien, who told Sinha, *"no, no, not [Sinha],"* which "**cannot happen at this point.**"[3] O'Brien's conclusion was that as long as Zakahi was Provost, Sinha would not be department chair. Per Stephens, the only "problems" involving the Finance Department preceded Sinha being in the college. Per Kastberg, the lawsuit did not bring out any details about Sinha's conduct that could have disqualified Sinha from being chair. Sinha was qualified according to O'Brien, Kerr, and—as previously mentioned—the entire Finance Department. Nothing controversial involving Sinha had occurred since Sinha filed his lawsuit (as shown by that there were no complaints to either Kerr or Stephens). However, this was the first opportunity Zakahi had to retaliate

---

[2] When Sinha alleges that someone employed by Bradley that is acting within the scope of their employment with Bradley says something, it is admissible. Sinha has personal knowledge of the conversation. Fed. R. Evid. R. 602. It is not hearsay. While it is an out of court statement asserted for the truth of the matter asserted, it is exempt from hearsay by Federal Rules of Evidence Rule 801(d)(2)(D) as an Opposing Party's Statement. See, e.g., *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822–23 (7th Cir. 2011) (finding Plaintiff's allegation that a co-worker told Plaintiff that Plaintiff was terminated because she was pregnant and took medical leave was admissible).

[3] This is admissible. Sinha has personal knowledge of the conversation with O'Brien, when O'Brien told Sinha that Zakahi said this. While this conversation appears to involve "double hearsay," both levels of hearsay are exempt by definition under Federal Rules of Evidence Rule 801(d)(2)(D) as an Opposing Party's Statements. See, e.g., *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822–23 (7th Cir. 2011).

against Sinha. Therefore, a reasonable jury could find that Zakahi's "no, no, not [Sinha]" and that Sinha as department chair "cannot happen at this point" were ambiguous statements of retaliatory animus. See *Kelley v. Costco Wholesale Corp.*, 2023 WL 1782688 at *10 (S.D. Ind. Feb. 3, 2023) ("In instances where there is a prolonged gap between a protected activity and the adverse action, the plaintiff must introduce additional evidence to establish a causal connection, such as 'evidence of prolonged antagonism against the plaintiff, evidence that, despite a long gap, the alleged retaliation was the first opportunity for retaliation, or something similar.'") (quoting *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022)) (citing *Malin v. Hospira, Inc.*, 762 F.3d 552, 559–60 (7th Cir. 2014)).

Third, a reasonable jury could then find that, due to his retaliatory animus, Zakahi told Gribb not to approve Sinha's unanimous election. Zakahi and Gribb both admit that Zakahi sent Gribb the Title IX investigation and the human resources report that were heavily mentioned in Sinha's lawsuit. Thus, a reasonable jury could find that Zakahi and Gribb were discussing Sinha and his history with Zakahi—including Sinha's protected conduct. Gribb was new to Bradley and the finance department, yet—just ten days in and without discussing with the department—told Sinha that she would not confirm Sinha's election, if he were to be elected. Thus, a reasonable jury could find that Gribb would not have done so without Zakahi telling Gribb not to confirm Sinha's election. Zakahi all but confirmed the same, as he admitted that he would have expected the dean to discuss such a failure to ratify a department chair election before doing so. Zakahi's

42

aforementioned retaliatory animus is a reasonable explanation for why Zakahi would tell Gribb not to ratify Sinha.

Fourth, a reasonable jury could find that Gribb then adopted this discriminatory animus. Gribb recalled meeting with Sinha prior to the election, and only 10 days after starting at Bradley. According to Sinha, in that meeting, Gribb told him she would not ratify his election under any circumstances (which would naturally include a future memorandum of his professional activities), was rude to him, kept interrupting him, and told Sinha he was being **difficult**. Given that Gribb had only been at Bradley for 10 days, had spoken with Zakahi regarding Sinha, had not spoken to anyone else in the department, and her only interaction with Sinha was him asking to follow the handbook, a reasonable jury could find that Gribb adopted Zakahi's retaliatory animus. Specifically, a reasonable jury could find—given the foregoing—that calling Sinha "difficult" was an ambiguous statements of retaliatory animus that referenced his lawsuit (i.e., asking to follow the handbook was difficult in light of Sinha's history of being "difficult" for Bradley, which includes his protected conduct). Then, it is uncontroverted that, after Sinha's unanimous election, Gribb followed through with her promise to not ratify his election.

Other ambiguous statements that, in light of the above, a reasonable jury could interpret as pointing toward knowledge of retaliatory animus include: O'Brien stating that the department did not get to have its say as to who would be the leader for the department; O'Brien stating that putting Sinha as associate dean

43

would not go well with the upper administration; and Kerr stating that the problem laid with the Provost's office, not with the department.

For the reasons set forth above, when considering the context surrounding the ambiguous statements and making all reasonable inferences in Sinha's favor, a reasonable jury could find that Gribb refused to ratify Sinha's election because she learned about his protected conduct.

## II.    Pretext.

When viewing the record in the light most favorable to Sinha and drawing all reasonable inferences in his favor, a reasonable jury could find but-for causation between Sinha's protected activity and Bradley's failure to promote Sinha because there is evidence that Bradley's proffered reasons for refusing to ratify Sinha's election are pretext.

First, there is evidence of shifting reasons. "Shifting and inconsistent explanations can provide a basis for a finding of pretext." *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569 (7th Cir. 2003). Here, Gribb stated that she would not ratify Sinha's election, if he were to be elected, because "she had heard and read about why Sinha was removed as Department Chair." Then, upon his election, she alleged that she did not ratify his election because the "toxicity report" did not include a list of his professional development activities.

Second, a reasonable jury could find that both of these proffered reasons were pretext. When considering them together, Gribb failed to inform the department of either reason, in violation of the handbook. Gribb was willing to do so in another

44

department. Therefore, a reasonable jury could find that Gribb refused to meet with the department because she knew the department knew that her reasoning was pretext. A reasonable jury can also find these reasons fail when considered on their own.

In regard to Gribb's first proffered reason: Sinha was removed as Department Chair in 2017—approximately five years prior to Gribb's failure to ratify his election. Gribb was to evaluate Sinha for his conduct at the time of the election—not due to a five-year-old report. See *Adebiyi v. South Suburban College*, 98 F.4th 886, 894 (7th Cir. 2024). A reasonable jury could find that Gribb could not have believed that Sinha's conduct at the time of the election was problematic because nothing controversial involving Sinha had occurred since Sinha filed his lawsuit (as shown by that there were no complaints to either Kerr or Stephens). Further, a reasonable jury could find the five-year-old reports did not contain anything permanently damaging to Sinha. Per Stephens, the only "problems" involving the Finance Department preceded Sinha being in the college. Per Kastberg, the lawsuit did not bring out any details about Sinha's conduct that could have disqualified Sinha from being chair. Sinha was qualified according to O'Brien, Kerr, and the entire Finance Department (which unanimously elected him). Therefore, Gribb could not have actually considered, or been offended by, the five-year-old report. See also *Harden v. Marion County Sheriff's Dept.*, 799 F.3d 857, 864 (7th Cir. 2015) (noting misrepresentations in a report is sufficient for pretext [Sinha believes it naturally follows that misrepresentation of a report is enough for pretext]).

45

In regard to Gribb's second proffered reason: A reasonable jury could find that Gribb was lying because she had already told Sinha that she would not ratify his election—no matter what. Next, a reasonable jury could find Gribb was lying because Sinha included professional development activities, like meditation courses, to help his ability to empathize with others and which did help his ability to do so. Next, in even requesting a list of Sinha's professional development activities Gribb mirrored Katsberg's earlier insinuation that Sinha should seek out professional development activities to help regain trust within the department. A reasonable jury could find Sinha had already regained trust in the department because the department unanimously elected him as chair. Additionally, that Gribb mirrored Katsberg shows coordination with upper levels of Bradley's administration, to concoct a reason to defend her refusal to ratify Sinha's election after she told Sinha she would not ratify him if he were elected. Accordingly, the list of professional development activities was set up as an unattainable goal, after the decision had been made. See, e.g., *Sargis v. Amoco Corp.*, 996 F.Supp. 790, 794 (N.D. Ill. Feb. 20, 1998). Therefore, for a number of different reasons, a reasonable jury could find that Gribb allegation that she refused to ratify Sinha due to a lack of professional development is pretext.

For the reasons set forth above, there is evidence a reasonable jury could use to find Gribb's proffered reasons for failing to ratify Sinha are pretext.

46

III.    Evidence as a whole.

When taken as a whole, it is clear that there is enough evidence to determine that Gribb's proffered reasons for failing to ratify Sinha are pretext. The question then becomes what could a reasonable jury believe Gribb was lying for? For the reasons previously articulated, a reasonable jury could find Gribb was lying because she learned about Sinha's protected conduct from Zakahi and agreed with Zakahi that Sinha's protected conduct made him too "difficult" to be department chair.

## Conclusion

For the reasons set forth herein, this Honorable Court should deny Bradley's Motion for Summary Judgment and provide further recourse as this Court deems just and equitable.

Amit Sinha, Plaintiff

By: /s/ Julie L. Galassi

JULIE L. GALASSI, Esq., Bar No. 6198035
Attorney for Plaintiff
HASSELBERG, ROCK, BELL & KUPPLER, LLP
423 SW Washington Street
Peoria, Illinois 61602
Telephone:  (309) 688-9400
Facsimile:  (309) 688-9430
E-mail:       jgalassi@hrbklaw.com
                 aswearingen@hrbklaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

William R. Kholhase
Miller, Hall & Triggs
416 Main Street, Suite 1125
Peoria, Illinois 61602-1161
Email: william.kohlhase@mhtlaw.com

I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

None.


Amit Sinha, Plaintiff

/s/ Julie L. Galassi
JULIE L. GALASSI, Esq., Bar No. 6198035
Attorney for Plaintiff
HASSELBERG, ROCK, BELL & KUPPLER, LLP
423 SW Washington Street
Peoria, Illinois 61602
Telephone: (309) 688-9400
Facsimile: (309) 688-9430
E-mail:      jgalassi@hrbklaw.com
             aswearingen@hrbklaw.com