E-FILED
Monday, 23 March, 2026  04:18:19 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | |
|---|---|
| **AMIT SINHA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 24-CV-1059** |
| ) | |
| **BRADLEY UNIVERSITY,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## ORDER

Plaintiff, Amit Sinha, filed his Complaint (#1) against Defendant, Bradley University, on February 1, 2024. Plaintiff alleges Defendant retaliated against him when it denied him a promotion as Chair of the Finance Department due to his protected activity, in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e), and the Age Discrimination in Employment Act ("ADEA") (29 U.S.C. § 621). Defendant filed its Motion for Summary Judgment (#28) on May 14, 2025, to which Plaintiff filed a Response (#29) on June 4, 2025. Defendant filed its Reply (#30) on June 18, 2025. For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED.

## BACKGROUND

The following background facts are taken from Defendant's Undisputed Statement of Material Facts, Plaintiff's Additional Material Facts section in his Response, and the exhibits attached by the parties to their filings.

*The Parties*

Defendant Bradley University is a private university located in Peoria, Illinois. Defendant has five colleges, with the Dean of each college reporting to the University Provost. Plaintiff is employed by Defendant as a Professor of Finance. In 2013, Plaintiff began serving as the elected Chair of the Department of Finance and Quantitative Methods ("Finance Department").

*Plaintiff's Removal as Chair and Prior Litigation*

On November 9, 2016, the Faculty Grievance Committee reported to Defendant's then-President Gary Roberts that, due to a negative environment within the Finance Department, it recommended that Plaintiff be replaced as Chair. A Title IX investigation report dated March 7, 2017, found there was a dysfunctional environment in the Finance Department and, as a result, Plaintiff was removed as Chair on March 22, 2017.

On July 31, 2017, Plaintiff filed a charge of discrimination against Defendant, alleging that his removal as Chair was based on national origin discrimination, sex discrimination, and retaliation. On February 28, 2018, Plaintiff filed a second charge of discrimination alleging that Defendant retaliated against him for filing his July 2017 charge by denying him a promotion.

Plaintiff filed suit in federal court on August 31, 2018, based on the allegations in his 2017 and 2018 charges. This court entered summary judgment favor of Defendant, and that judgment was affirmed on April 26, 2021. *Sinha v. Bradley University*, 995 F.3d 568 (7th Cir. 2021). The instant claim against Defendant is based on Plaintiff's 2018 lawsuit.[1]

*Faculty Handbook*

Defendant's Faculty Handbook provides procedures for the election of department Chairs, which includes ratification by the Dean:

> The winner of the election is subject to ratification by the Dean of the College. If the Dean of the College does not ratify the winner, for reasons pertaining to the winner's inability to competently perform the roles of the Chairperson, the Dean must inform the Department of that decision and explain the rationale for that decision in a meeting of the Department's faculty members. The Dean must then call for a special election, to be held as soon as possible.

The Handbook further provides that there must also be a departmental vote to pursue an external (presumably "external" means someone outside of the Department) search for a department Chair.

*Events Following Plaintiff's Removal as Chair*

Following Plaintiff's removal as Chair in 2017, the Finance Department did not have an internally elected Chair for several years. During this period, Stephen Kerr served as acting Chair. Kerr was finishing his term as Chair of the Accounting Department for the 2021 academic year when, in late spring 2021, Matthew O'Brien, the

---

[1] Plaintiff's 2018 lawsuit against Defendant is itself the alleged protected activity for the instant claim. It is not his discrimination charges or any events predating it.

3

Interim Dean, asked him to serve as Chair of the Finance Department for one year while they searched for a permanent Chair.

In May 2021, the process to hire an external permanent Chair began, although Defendant never obtained a vote from the Finance Department faculty to pursue such a hire. In late 2021, Plaintiff raised concerns with Crystal Elliott, Defendant's Human Resources Director, about the Chair selection process not being followed as outlined in the Faculty Handbook. An external search for a new faculty member to serve as Chair was eventually stopped.

In January 2022, Molly Gribb, the new Dean of Defendant's Foster College of Business, decided to hold an election for Chair of the Finance Department. Around this same time, Gribb met with Plaintiff and allegedly accused him of obstructing the Chair selection process. Plaintiff claims that Gribb told him she would not ratify the election if he were to win, mentioning that she had heard about the Department's reputation and read about Plaintiff's removal as Chair before his term ended. Gribb does not recall the details of this meeting.

*The 2022 Chair Election and Non-Ratification*

Based on Gribb's comments at their meeting, Plaintiff was concerned about her, and on February 4, 2022, contacted Defendant's attorney, Erin Kastberg, for clarification regarding the 2017 events and the 2018 lawsuit, fearing they would affect his career. Kastberg assured Plaintiff that he was not banned from becoming Chair, but told him that he needed to rebuild trust.

Plaintiff ran for the Chair position and was elected unanimously on February 24, 2022. The next day, Gribb notified Plaintiff that she wanted to meet with him to discuss the election results, but asked that, before the meeting, Plaintiff send her a detailed list of the personal and professional development work he had completed to address the documented toxic work environment that had existed in the Finance Department while he was Chair. Plaintiff prepared the requested documentation. There is no evidence that prior Chairs were required to present professional development activities.

When asked by Gribb to identify professional development activities--defined as developing and improving skills such as planning, organization, leadership, and management--Plaintiff identified working on relationships with Defendant and third parties, as well as on "accreditation matters." Plaintiff contends he never defined the term "professional development activity" in his documentation.

On March 4, 2022, Gribb and Paul Stephens, the Associate Dean for the Foster College of Business, met with Plaintiff and informed him that Gribb would not ratify the election because Plaintiff's documentation did not show professional development activities. Gribb concluded that Plaintiff's documentation did not provide sufficient evidence that he had developed the leadership skills necessary to serve as Chair. The 2017 grievance report and potential climate of toxicity were also factors for Gribb. Gribb was the sole decisionmaker in the ratification process; the Provost at the time, Walter Zakahi, was not involved in the election.

*Post-Election Actions*

After declining to ratify the election, Gribb did not convene a meeting with the Finance Department faculty to explain her decision or call a special election, as required by the Faculty Handbook. She considered the meeting moot because Defendant had started exploring merging the Finance Department into the Economics Department, thereby eliminating the need for a separate Finance Department Chair.

*Summary of Witness Testimony*

The following witness summaries are included to provide additional factual detail and context relevant to the events described above.

**Plaintiff**

Plaintiff testified that, because of what he perceived as hostility from the Provost's office, he began documenting his conversations.

In March 2021, Plaintiff sought consideration for an Associate Dean position that had opened at the Foster College of Business. Plaintiff testified and documented that he asked O'Brien to consider him for that role, and O'Brien responded that placing Plaintiff in that position would not go well with upper administration. According to Plaintiff, O'Brien did not specify the reason, but mentioned that if possible, he would appoint Plaintiff as Finance Department Chair. Plaintiff also documented that after meeting with Zakahi about succession planning, O'Brien concluded that as long as Zakahi remained Provost, Plaintiff would not become Chair.[2]

---

[2] Defendant emphasizes these events occurred in March and April of 2021.

O'Brien planned to recommend hiring a new department Chair on April 1, 2021, and on March 31, Plaintiff asked O'Brien to not exclude him from consideration for the Chair position. According to Plaintiff, O'Brien later relayed that Zakahi's response was that O'Brien's recommendation could not happen at that point.[3]

Plaintiff testified that in April 2021, O'Brien told him he would be O'Brien's number one candidate for Chair, but that he was not allowed to make that appointment. Plaintiff further testified that O'Brien asked for approval from the Provost's office to fill the Finance Department Chair position externally, which was approved at a later time. Plaintiff did not remember the exact order of events and testified that no job posting appeared on professional websites in April 2021.

Plaintiff testified that on April 30, 2021, after the Seventh Circuit's decision in his 2018 lawsuit, he asked O'Brien what the plan was for the Finance Department. He stated that O'Brien said he was discussing the matter with Zakahi and had advocated for Plaintiff. O'Brien was preparing to leave his position and was trying to resolve succession issues before a new Dean arrived. O'Brien mentioned identifying individuals within the Foster College of Business who could serve as Interim Chair.

On May 5, 2021, Plaintiff wrote down that O'Brien told him Kerr would serve as Chair for the upcoming year. Plaintiff believed Kerr was an accounting professor finishing his term as Accounting Department Chair but was not entirely certain.

---

[3] Defendant maintains that Zakahi's response related to the Finance Department's leadership structure, not Plaintiff personally.

Plaintiff also asked O'Brien whether Zakahi had ever explained why Plaintiff was not allowed to become Chair. O'Brien replied that the only explanation he received was "no, no, not him." Plaintiff testified he was never given further details.

In another conversation, Plaintiff told O'Brien that he (Plaintiff) was not the reason for the problem within the Finance Department. O'Brien responded that Zakahi followed through with what Darrell Radson, the former Dean of the Foster College of Business, wanted and "had placed himself into a corner." O'Brien stated that the issue had gone on far too long and that the Department was left without leadership.

During finals week in May 2021, Plaintiff discussed leadership issues with Kerr. Plaintiff testified that he told Kerr the problem was not in the Department, noting that professors could disagree and still work professionally. Kerr indicated that the issue was with the Provost's office, not the Department.

Then, on June 10, 2021, Kerr informed Plaintiff that a request to hire an external Finance Department Chair had been filed with the Provost. Kerr would have completed the forms and passed them to O'Brien, who forwarded them to the Provost's office. Plaintiff testified that it was obvious Zakahi would not allow the Finance Department to elect its own Chair. There was no vote by Finance Department faculty requesting the appointment of an external Chair, and when informed of the request, Plaintiff did not show support or opposition, testifying that the appointment of an external Chair would have proceeded regardless of his opinion. Plaintiff also stated that he was opposed to an external hire.

8

Between June 2021 and January 2022, Kerr discussed the external Chair search with Plaintiff and asked whether Plaintiff wished to serve on the search committee. Plaintiff declined because he intended to apply for the Chair position.

On January 27, 2022, Plaintiff met with Gribb in his office. Plaintiff documented the meeting because much of the conversation bothered him. Plaintiff testified that he was shaken and attempted to document the interaction objectively, omitting comments he considered irrelevant. At this meeting, Gribb told Plaintiff that he was being "difficult" and that he was obstructing the process when Plaintiff insisted on following the Faculty Handbook, which required a departmental vote to pursue an external search.

The following day, Plaintiff briefed Kerr and Human Resources Director Elliott about this meeting with Gribb. Plaintiff testified that he told them Gribb's demeanor bothered him and suggested a negative predisposition towards him. Kerr responded that it was unfortunate the conversation occurred.

On February 3, 2022, Elliott emailed Plaintiff that the Faculty Handbook procedure would be followed. Stephens informed Finance Department Professor Phil Horvath that the election process detailed in the Faculty Handbook would be followed, meaning Gribb would call for an election, the recording secretary would be elected, and nominations would be taken. The nominations would then be finalized, and the work for the Chair election would proceed. Once the election process was complete, the recording secretary would notify Gribb of the winner, and the Dean's office would then issue the ratification.

9

On February 25, 2022, after Plaintiff was unanimously elected Chair of the Finance Department, Gribb sent him an email requesting a meeting and asked him to prepare documentation addressing his personal development. Plaintiff prepared and sent the documentation on February 28, 2022.

Plaintiff's documentation stated that there was no toxicity and that differences of opinion among faculty did not necessarily constitute toxicity. Plaintiff stated that the Human Resources Director, Nena Peplow[4], had not recommended his removal as Chair following the Title IX investigation.[5]

In his documentation, Plaintiff also included positive statements from colleagues dating from 2016, 2018, and 2020. He described professional relationships, awards, service activities, and personal development practices, including emotional awareness, meditation, empathy training, leadership, accreditation work, industry partnerships, and seminars. Plaintiff wanted to demonstrate that he was a contributing member of the Department with the best interests of its people in mind, and that he had learned to better manage people's reactions.

On March 4, 2022, in the presence of Stephens, Gribb informed Plaintiff that she would not ratify his election. The only reason provided to Plaintiff was that his documentation did not demonstrate professional development activities.

---

[4] Plaintiff identifies Peplow as Human Resources Director at this time, although other facts indicate Elliott was Human Resources Director.

[5] Defendant maintains that Plaintiff's cited testimony states that Peplow "told me she had not asked for my removal as Department Chair."

Plaintiff testified that the Faculty Handbook required Gribb to explain non-ratification to the Department and that this did not occur. Defendant's President did not respond to Plaintiff's emails requesting a meeting.

**Molly Gribb**

Gribb served as the Dean of the College of Engineering and the Foster College of Business from January 2022 to August 2023. Gribb was responsible for all personnel, facilities, and academic programming.

Gribb testified that when she assumed the role, she was informed of Stephens's and O'Brien's efforts to begin an external search for a Finance Department Chair. Gribb stated that it became clear to her that the Faculty Handbook was not being followed and that the process needed to be brought in compliance with the Handbook.

Gribb testified that in late January 2022 she reviewed internal documents related to the 2017 grievance involving Plaintiff. She received those materials from the Provost's office. Gribb stated that after reviewing the materials, she had concerns about the Department and about Plaintiff's leadership skills. She did not recall speaking with any faculty members, Kerr, or O'Brien about the climate in the Finance Department. Gribb also did not remember speaking with anyone about Plaintiff's ability to successfully serve as Chair before the election.

Gribb did not conduct any inquiry or investigation into whether faculty members had filed grievances after the 2017 written grievance. She testified that she did not know whether Defendant took any steps after the grievance report to train or teach faculty to avoid toxicity toward one another. Additionally, she was unaware of the

11

training available to department Chairs or whether any outside training options were offered to Plaintiff after 2017.

Gribb could not recall discussing toxicity concerns with Plaintiff before the election, but she remembered having a meeting with him. She did not remember the specifics of that discussion and only testified that it occurred about a week and a half after she started her job in January 2022. She could not recall whether she told Plaintiff that he was obstructing the process. Gribb also could not recall saying that if she followed the Chair selection process and Plaintiff was elected, she would under no circumstances ratify the election. She testified that this was the only meeting she had with Plaintiff before the election.

After the election, Gribb asked Plaintiff to provide written documentation of any professional development activities he may have undertaken to prepare himself for leading the Department successfully. Gribb testified that Plaintiff's unanimous election in 2022 did not prove the absence of toxicity in the Department because, in her view, it could mean that people were afraid to vote otherwise. Gribb could not recall having met with Plaintiff to discuss the documentation or any interactions with him regarding it. Gribb claimed that the professional development documentation Plaintiff submitted did not contain evidence that he had worked on developing the leadership skills she believed were necessary to serve as Department Chair.

Gribb did not meet with the Finance Department to discuss her reasons for non-ratification. She testified that she determined the meeting was moot because Defendant

12

had begun exploring a merger of the Finance Department with the Economics Department, which would eliminate the need for a separate Finance Department Chair.

As for whether Zakahi ever spoke with Gribb about Plaintiff and his prior service as Chair or the upcoming election, Gribb testified that they discussed it after the election, although she did not remember many of the conversation's details. Gribb could not recall whether she had any idea what Zakahi's feelings were about Plaintiff becoming Chair. She also did not remember having a meeting with Defendant's President to discuss Plaintiff.

Gribb had no information, either in writing or from conversations with anyone, indicating that Plaintiff had ever intimidated any faculty member during the previous election or the 2022 election. However, Gribb also testified that one professor in the Finance Department, Xiaochuan Tong, expressed concern about how senior faculty might respond to his vote and how he might be treated if he did not go along with Plaintiff's election.

Gribb recalled not ratifying an election in another department, Mechanical Engineering. In that instance, Professor Shannon Timpe's interactions with Gribb were adversarial, and he was not very cooperative. There were ten or twelve faculty members in Timpe's Department. Gribb could not remember the breakdown of the vote in that election, but testified that she met with the entire department afterward and explained why she did not ratify the election. Gribb stated that Timpe lacked the leadership and administrative qualities necessary to succeed.

**Stephen Kerr**

Stephen Kerr served as Acting Chair of the Finance Department for a period. Kerr understood his role to include helping the Finance Department find a permanent Chair. Kerr testified that he did not know why the Finance Department had gone four years without a permanent Chair and was unable to elect one, which he found unusual.

Kerr further testified that his mandate upon assuming the role was to hire a new faculty member who could serve as Chair. Kerr testified that he did not know why an external faculty member would serve as Chair instead of an internal candidate elected by the Department. Kerr testified, however, that he had no reason to question Zakahi on that issue. Kerr testified that the decision to pursue an external Chair was at Zakahi's direction. When hiring an external Chair came up in Finance Department discussions, Kerr told the faculty that "what is done is done…there is a search underway to do this…there's no point in talking about something that – a decision's been made."

Kerr was still Chair when the decision was made to stop seeking an external Chair. Kerr was under the impression that Gribb felt the Department did not have enough students at that point to justify adding a fifth faculty member, and that the search therefore stopped.

Kerr testified that, during his tenure as Acting Chair, Plaintiff was eligible to serve as Chair and that Plaintiff was a very robust scholar and quite good at his scholarship. Kerr interacted with Plaintiff anywhere from three times a month to weekly, including at Department meetings for an hour, as well as through hallway conversations and other typical collegial interactions. Kerr recalled that in early 2022,

14

possibly January, he had a conversation with Plaintiff regarding his interactions with

Gribb over the election. Kerr testified that non-ratification of an election is rare but not

unheard of.

**Matthew O'Brien**

Matthew O'Brien served as Interim Dean of the Foster College of Business from

February 1, 2018, through mid-January 2022. As Interim Dean, O'Brien oversaw hiring

and matriculation, onboarding of new faculty members, and made appeals to the

Provost regarding staffing needs for faculty and staff positions.

O'Brien testified that during his tenure, he did not recall any problems with

infighting among Finance Department faculty and believed that the faculty got along

well with one another. O'Brien also nominated Plaintiff for one of the Chaired

professorships.[6] O'Brien testified that he informally discussed with Zakahi that

underutilized Chaired professorship resources should be allocated to individuals

within the relevant discipline and identified Plaintiff as one such individual. O'Brien

also testified that he discussed with Zakahi the possibility of Plaintiff filling the

Stevenson professorship or another Chaired professorship, but he could not recall

whether Zakahi supported Plaintiff receiving either position.

O'Brien testified that during his four-year period as Interim Dean, he discussed

the Finance Department Chair position with Zakahi on three to five occasions. During

those discussions, O'Brien offered options to restore the Finance Department to a

---

[6] Defendant emphasizes that this testimony relates to Chaired professorships that were available, not the Department Chair position.

faculty-governance model. He informed Zakahi that Plaintiff was interested in becoming Chair. He also informed Zakahi that Plaintiff had previously served as Chair.

O'Brien denied telling Plaintiff that as long as Zakahi was Provost, Plaintiff would not be Chair. O'Brien testified that he relayed to Plaintiff that he had advocated for someone within the Department to be Chair, and that Plaintiff was certainly among the individuals O'Brien believed would have been appropriate. O'Brien also testified that after he presented options for departmental self-governance, Zakahi eventually said they should find another external Chair. Additionally, O'Brien testified that he never learned the reasons why Zakahi would not allow an election.

O'Brien was aware that Plaintiff had sued Defendant. He also testified that Plaintiff was qualified to be Chair. O'Brien testified that he had no reason to believe Plaintiff was unsuitable to serve as Finance Department Chair and did not recall Zakahi using words about Plaintiff to the effect of "no, no, not him." However, when O'Brien was asked if he told Plaintiff that he would appoint Plaintiff Chair if he (O'Brien) had the ability to do so, O'Brien responded "I don't believe so."

O'Brien testified that Plaintiff expressed interest in becoming an associate dean and that Plaintiff was qualified for that role. O'Brien ultimately hired Plaintiff as a coordinator, a position that did not require Provost or Presidential approval.

**Walter Zakahi**

Walter Zakahi served as Provost during the relevant period. Zakahi testified that he could not remember any conversations with O'Brien about Plaintiff becoming Chair. Zakahi also testified that he had no recollection of telling O'Brien that as long as he was

16

Provost, Plaintiff would not be Chair. He did not recall whether O'Brien supported Plaintiff being the Chair.

Zakahi said that he had concerns about Plaintiff serving as Chair based on Plaintiff's previous experience in that role, including what Zakahi described as toxicity within the Department, a lack of leadership, and the fact that he had received two different investigation reports indicating that Plaintiff should be removed as Chair. Zakahi also testified that he had no recollection of O'Brien or anyone else informing him that the Department's toxicity existed long before Plaintiff became Chair.

Zakahi recalled that Plaintiff was elected Chair and that Gribb did not ratify the election. Zakahi testified that he had no memory of any discussions with Gribb about either ratification or non-ratification of Plaintiff's election. Zakahi further testified that he had no memory of any conversations with Gribb about Plaintiff's election more generally.

Zakahi recalled that other individuals were involved in the election process, but he did not remember exactly who. He testified that the election happened shortly after Gribb's appointment as Dean, and stated that, regarding whether he ever discussed Plaintiff's pre-2020 removal as Chair with Gribb, he sent her reports from the Title IX investigation and from Human Resources.

Zakahi agreed that there had been only a couple of instances in which an election was not ratified. Zakahi testified that those decisions may have been discussed with him, but he did not remember. Zakahi also said he would have expected a Dean to

17

discuss such a decision with him beforehand, but he had no recollection of any such discussion with Gribb.

Zakahi testified that it was his idea to remove Plaintiff as Chair in 2017 and that he made the sole decision to do so.

**Paul Stephens**

Paul Stephens ran the 2022 Finance Department Chair election, likely at Gribb's request. Stephens testified that he explained to Plaintiff and Horvath his role in the election process and that, at some point, his responsibilities ended and the matter was handed off to Gribb and Zakahi, and that he had no control over the process after that point. Stephens testified that his position would have been to urge Gribb to ratify the election regardless of who was elected.

Stephens testified that he did not believe he would have told Horvath or Plaintiff that Gribb and Zakahi would not ratify Plaintiff's election.

Stephens testified that Gribb told Plaintiff that she would not approve the election, but that Gribb had not informed Stephens in advance of that decision. He stated he was surprised by the decision not to ratify Plaintiff's election. Stephens also testified that Gribb would have had to provide a reason for not ratifying the election, but that Gribb never informed him (Stephens) what that reason was. Stephens testified that he did not remember whether Gribb provided a reason during the meeting with Plaintiff.

Stephens testified that he did not recall expressing at the meeting with Gribb and Plaintiff that the problems that had existed in the Finance Department were not

18

Plaintiff's creation, though he testified that he was aware, based on his long tenure, that some problems in the Department predated Plaintiff's employment.

At the time of the 2022 election, Stephens was not aware of any perceived problems, whether true or not, that Plaintiff was causing within the Finance Department. None of the faculty members, tenured or not, complained to him about Plaintiff in 2022.

Stephens denied telling Plaintiff after the February 2022 Finance Department meeting that it had taken years to correct the wrong done to him.

**Crystal Elliott**

Crystal Elliott served as Defendant's Human Resources Director beginning in January 2020. In late 2021, Elliott met with Plaintiff regarding his concerns about retaliation in compliance with the Faculty Handbook regarding the hiring of the Finance Department Chair. Elliott subsequently followed up by email, indicating that she had looked into Plaintiff's concerns and that Defendant would follow the Faculty Handbook. Elliott testified that she most likely discussed these issues with the Provost's office.

**Erin Kastberg**

Erin Kastberg served as counsel for Defendant and was involved in legal issues arising out of Plaintiff's 2017 removal as Finance Department Chair.

On February 4, 2022, Plaintiff emailed Kastberg seeking clarification regarding his prospects at Defendant following his 2017 removal as Chair and subsequent litigation. Plaintiff told Kastberg that, because he had lost his appeal, he hoped for a

19

fresh start, particularly with the arrival of a new Dean at Foster College of Business. Plaintiff stated that he did not believe that would occur based on his January 27, 2022, conversation with Gribb. Plaintiff told Kastberg that Gribb had informed him that she had heard and read about the reasons for his removal as Chair and that, if he were elected Chair, she would not ratify the election. In the same communication, Plaintiff asked Kastberg whether his removal as Chair and the subsequent lawsuit amounted to a permanent "career path death sentence."

On February 7, 2022, Kastberg responded to Plaintiff, stating that the prior incidents did not mean he could never be a department Chair. Kastberg stated that Plaintiff would need to rebuild trust within the Finance Department and that the facts determined through the investigation were relevant and could properly be weighed by Gribb. Kastberg further told Plaintiff that rebuilding trust takes time and suggested that he undertake personal and professional development opportunities.

Kastberg testified that when she referred to "facts" learned through the lawsuit and investigation, she was not aware of any specific "dirt" or undisclosed information that would hamper Plaintiff's ability to serve as Finance Department Chair.

## ANALYSIS

Defendant argues that summary judgment should be granted in its favor because there is no causal connection between Plaintiff's 2018 lawsuit and Gribb's refusal to ratify his election.

20

*Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture. See *Singer*, 593 F.3d at 533. In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp.2d 815, 835 (C.D. Ill. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). "Summary judgment 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Koszola v. Bd. Of Educ. Of City of Chicago*, 385 F.3d

21

1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

*Retaliation in General*

"Title VII prohibits an employer from retaliating against an employee 'because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing.'" *Lesiv v. Illinois Central Railroad Co.*, 39 F.4th 903, 911 (7th Cir. 2022), quoting *Igasaki v. Illinois Department of Financial and Professional Regulation*, 988 F.3d 948, 959 (7th Cir. 2021), citing 42 U.S.C. § 2000e-3(a). Similarly, "[t]he ADEA provides that it is 'unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.'" *Horwitz v. Bd. of Educ.*, 260 F.3d 602, 612 (7th Cir. 2001), citing 29 U.S.C. § 623(d).

To defeat summary judgment on a retaliation claim under Title VII and ADEA case,[7] a plaintiff "must offer evidence from which a reasonable jury could find: '(1) he engaged in an activity protected by the statute; (2) he suffered an adverse action; and (3)

---

[7] Both the Title VII and ADEA counts involve the same standard to establish a prima facie case for retaliation. Both parties in their filings discussed them contemporaneously. As such, this court will do the same. See *Horwitz*, 260 F.3d at 612.

22

there is a causal link between the protected activity and the adverse action.'" *Lesiv*, 39 F.4th at 911, quoting *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018).

"The evidence presented 'must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself …. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded.'" *Lesiv*, 39 F.4th at 911, quoting *Ortiz v. Werner Enterprises, Inc,*, 834 F.3d 760, 765 (7th Cir. 2016). "Ultimately, the inquiry comes down to one question: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused' the materially adverse action?" *Lesiv*, 39 F.4th at 911, quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).

Defendant does not contend that Plaintiff failed to show the first two elements: the protected activity (his first lawsuit filed in 2018) and the adverse action (the failure to ratify his election as Finance Department Chair). Rather, Defendant argues that retaliation cannot be proven because the evidence does not establish the third element: a causal connection between the protected activity and the adverse action.

Defendant argues that the Faculty Handbook does not restrict a Dean's discretion in deciding whether to ratify an election, Gribb's reasons were valid and within her authority, and the time gap between the protected activity and the alleged retaliation is too great to establish causation. Plaintiff responds that there is evidence of ambiguous statements indicating animus toward Plaintiff and pretext that creates an issue of fact regarding the true reasons for Gribb's refusal to ratify.

23

*Causal Link*

In a retaliation claim under Title VII and the ADEA, there must be a "but-for" causal connection between the protected activity and the adverse action. *Xiong v. Board of Regents University of Wisconsin System*, 62 F.4th 350, 355 (7th Cir. 2023); *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 918 (7th Cir. 2025). "But that standard, as case law explains, 'does not mean that the protected activity must have been the only cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity.'" *Xiong*, 62 F.4th at 355, quoting *Lesiv*, 39 F.4th at 918.

To show that retaliation was the "but-for" reason for the adverse action, a plaintiff can use either direct or circumstantial evidence. *Rowlands v. United Parcel Service – Fort Wayne*, 901 F.3d 792, 901 (7th Cir. 2018); *Murphy*, 140 F.4th at 918. For example, an admission that Gribb did not ratify Plaintiff's election in retaliation for filing his 2018 lawsuit would be direct evidence. However, because direct evidence usually requires such an admission from the employer, it is rare. *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008). Here, Plaintiff does not have that direct evidence establishing retaliation. Plaintiff must therefore rely on circumstantial evidence like "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Murphy*, 140 F.4th at 918, quoting *Gnutek v. Illinois Gaming Board*, 80 F.4th 820, 824 (7th Cir. 2023).

24

Plaintiff presents two types of circumstantial evidence to demonstrate a causal link between his 2018 lawsuit and the non-ratification of his election: (1) ambiguous statements made by Gribb, Zakahi, and O'Brien; and (2) pretext.

**Ambiguous Statements**

Plaintiff argues that ambiguous statements of animus made by Gribb, Zakahi, and O'Brien are evidence of a causal link between his 2018 federal lawsuit and Gribb's refusal to ratify his election as Chair. His argument is divided into four parts: (1) Zakahi made ambiguous statements and retaliated against Plaintiff; (2) Zakahi told Gribb not to approve Plaintiff's election due to his "retaliatory animus;" (3) a reasonable jury could find that Gribb adopted this discriminatory animus; and (4) a reasonable jury could interpret other ambiguous statements as "pointing toward knowledge of retaliatory animus."

Taking all of the evidence in the light most favor to Plaintiff, and drawing all reasonable inferences therefrom, the court finds that a reasonable juror could find both that Zakahi did harbor an animus towards Plaintiff and that he influenced Gribb not to ratify Plaintiff's election as Finance Department Chair. Zakahi made statements in opposition to Plaintiff being made Chair of the Finance Department. Moreover, there is evidence that Zakahi had at least *some* form of communication with Gribb concerning Plaintiff around the time of Plaintiff's election when he sent her the reports from the Title IX investigation and Human Resources. Finally, although in this case Gribb was the ultimate decisionmaker despite Zakahi being her superior (and, in his position as Provost, the ultimate decisionmaker in the removing of Plaintiff as chair back in 2017), it

25

would be reasonable for a juror to infer that Gribb, particularly as a new hire, would be influenced by her boss's sentiments against Plaintiff becoming Finance Department Chair.

Zakahi's influence nothwithstanding, there is simply no evidence in the record, outside of pure speculation, that Zakahi was motivated by a retaliatory animus over *the protected activity*, the 2018 lawsuit. Zakahi's testimony on this matter in this case is consistent with his reasoning for removal Plaintiff as Chair back in 2017. Here, Zakahi testified that he had concerns about Plaintiff serving as Chair based on Plaintiff's previous experience in that role, including what Zakahi described as toxicity within the Department, a lack of leadership, and the fact that he had received two different investigation reports indicating that Plaintiff should be removed as Chair. This is consistent with Zakahi's reasoning for removing Plaintiff as Chair the first time around, where Zakahi "decided to address the 'problems of culture and toxicity' in the [Finance Department] so that 'the department [could] work in a different way.'" *Sinha*, 995 F.3d at 572.

There is nothing in the record to indicate that Zakahi changed his mind regarding Plaintiff's leadership capabilities in the years since he removed Plaintiff as Chair, whether through an internal softening of opinion on Zakahi's part or corrective action on Plaintiff's part. The mere filing of the 2018 lawsuit cannot act to supplant a prior, legitimately held opinion on the part of Zakahi as to Plaintiff's unfitness for the position of Finance Department Chair. In other words, when there is no evidence to suggest that, but for the 2018 lawsuit, Zakahi would have changed his mind as to

26

Plaintiff's suitability for the Chair position, the fact that Plaintiff filed a lawsuit does not replace a *legitimate,* pre-existing basis for animus against Plaintiff being Chair with an improper retaliatory animus.

This is not a situation where Zakahi's animus towards Plaintiff is inexplicable absent the 2018 lawsuit. Zakahi had well-documented, on-the-record reasons for his removal of Plaintiff as Chair in 2017, and those reasons are consistent with his stated reasons opposing Plaintiff for Chair in the instant case.

**Pretext**

Next, Plaintiff posits that a reasonable jury could find a causal link because there is evidence that Defendant's proffered reasons for non-ratification are pretext.

The circumstantial evidence Plaintiff may present to demonstrate a causal link between his protected activity and his non-ratification includes "evidence the employer's proffered reason for the adverse action was pretextual." See *Crain v. McDonough*, 63 F.4th 585, 593 (7th Cir. 2023). An employer's proffered reason is pretextual if it is an attempt to mask a discriminatory reason with a legitimate excuse. *Crain*, 63 F.4th at 593. "Pretext is not just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Crain*, 63 F.4th at 593 (cleaned up). To demonstrate pretext, Plaintiff must identify such weaknesses, implausibilities, inconsistencies, or contradictions in Defendant's stated reasons that would permit a reasonable person to conclude that the stated reasons are unworthy of credence. See *Crain*, 63 F.4th at 593.

27

Objective Standards

First, Plaintiff argues that because there was no objective standard for what Defendant considered when selecting a department Chair, the "conditions were ripe for discrimination." Plaintiff cites several cases from the Seventh Circuit to argue that a lack of objective standards is highly susceptible to abuse and can violate Title VII. See *Stewart v. Gen. Motors Corp.*, 542 F.2d 445 (7th Cir. 1976); *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302 (7th Cir. 1988); *Hernandez v. City Wide Insulation of Madison, Inc.*, 508 F. Supp. 2d 682 (E.D. Wis. 2007). However, Defendant points out that *Stewart* and *Sears* were discrimination cases where the issue was whether the employer's subjective hiring procedures were neutral, and the issue in *Hernandez* was whether an employee was similarly situated to another based on the employer's subjective disciplinary standard. Defendant contends these cases do not support Plaintiff's claim that subjective standards imply discriminatory intent.

While Plaintiff's point about subjective standards is well-taken, the Seventh Circuit has stated that "nothing in Title VII bans outright the use of subjective evaluation criteria." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1176 (7th Cir. 2002), quoting *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998). In fact, "subjective evaluations of a job candidate are often critical to the decisionmaking process…." *Millbrook*, 280 F.3d at 1176, quoting *Denney v. City of Albany*, 247 F.3d 1172, 1185-86 (11th Cir. 2001); *Cunningham v. Austin*, 125 F.4th 783, 790 (7th Cir. 2025) ("As we have previously explained, subjective evaluations of a job candidate are often critical to the decisionmaking process. So, absent evidence that subjective hiring criteria were used as

28

a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII.") (cleaned up). The caselaw establishes that Defendant is permitted to use subjective standards in its decisionmaking process for selecting department Chairs. At the same time, the court will take into account the fact that subjective criteria were used in the selection of Finance Department Chair in determining whether Gribb used that criteria as a mask for retaliatory animus.

Shifting Reasons

First, Plaintiff argues that Defendant has proffered shifting or inconsistent reasons for Gribb's refusal to ratify his election as Finance Department Chair. Shifting reasons or inconsistent explanations can be a basis to infer pretext. *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003).

According to Plaintiff, before the election, Gribb allegedly stated she would not ratify his election because she had heard and read about his prior removal as Chair (the "first reason"). After the election, she cited his failure to demonstrate sufficient professional development addressing leadership and toxicity concerns (the "second reason").[8]

Defendant responds by arguing that, even if true, those reasons are not inconsistent. The court agrees. The first reason stems from Plaintiff being removed as Chair in 2017 due to toxicity reports within the Department. The second reason

---

[8] Technically, a third reason proffered by Defendant, although not much discussed, was the merging of the Finance and Economics Departments.

29

similarly stems from the toxicity reports and Plaintiff's efforts to show professional

development activities to address the problem. Accordingly, both reasons involve the

same underlying event: the 2016 Title IX grievance. Therefore, if these reasons are true,

they are not necessarily "shifting" reasons for his non-ratification.

Even accepting Plaintiff's account that Gribb expressed she would not ratify his

election due to the grievance, that is also not evidence of retaliation in this case. The

relevant inquiry is not whether Gribb had doubts about Plaintiff's history as Chair, but

whether the stated reason was a lie designed to conceal a retaliatory motive tied to

Plaintiff's 2018 lawsuit.

Pretextual Reasons

Next, Plaintiff argues that, even if the reasons given by Gribb were not

inconsistent, a reasonable jury could find that both of those proffered reasons were a

pretext to disguise a retaliatory animus on her part.

With respect to the first reason, Plaintiff contends that Gribb could not have

genuinely believed that Plaintiff's conduct was problematic, since nothing had

happened between his removal as Chair in 2017 and the 2022 election, and that Gribb

could not have actually considered or been offended by the Title IX report.[9] Regarding

the second reason, Plaintiff asserts that a reasonable jury could find Gribb was lying

because she had already told him she would not ratify his election, and that Plaintiff

---

[9] Plaintiff also asserts that misrepresentations about his conduct in the Title IX report is enough for pretext. The court rejects that argument as the record does not indicate the Title IX grievance report misrepresented Plaintiff's conduct. Plaintiff also does not state what those exact misrepresentations in the report were.

actually included professional development activities in his report, but that Gribb's

request regarding professional development was designed to set an unattainable goal.

Defendant responds that these claims are speculative; that nothing in the Faculty

Handbook limits the factors the Dean may consider when ratifying an election and that

Gribb simply wanted to know if there were professional development activities she

should think about when deciding whether to ratify.

Based on the evidence in the record, no reasonable jury could find that the

reasons for the non-ratification were unworthy of credence. It is true that the record

does not include a checklist of the professional development required for ratification,

nor does the record provide evidence that prior Chairs were required to submit similar

documentation. However, the Faculty Handbook provides that ratification may be

denied for reasons pertaining to the winner's "inability to competently perform the

roles of the Chairperson." That language is broad and does not limit what the Dean

may consider. It also does not prohibit the Dean from requesting additional information

relevant to leadership competence, particularly when the candidate had previously

been removed from the same role.

Plaintiff has not identified evidence that Gribb ever referenced his 2018 lawsuit

when explaining her decision. He also has not shown that the professional development

rationale was factually impossible, internally contradictory, or invented after his

lawsuit began. The record reflects that Gribb requested documentation, reviewed what

Plaintiff submitted, and concluded it did not sufficiently demonstrate growth in

leadership skills, considering Plaintiff's prior removal from the role in the face of the

31

toxicity issues in the Department. Even if that conclusion was unwise or wrong, the evidence does not lead to the inference that Gribb was *lying* in order to cover up a refusal to ratify due to Plaintiff's 2018 lawsuit when she judged Plaintiff's submission to be insufficient for her purposes. See *Ptasznik v. St. Joseph Hospital*, 464 F.3d 691, 697 (7th Cir. 2006) ("Nevertheless, it is not our role to determine the competency of or interfere in employment decisions simply where we believe an employer has made a poor choice. Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair.").

On the other hand, Plaintiff's strongest pretext argument concerns Gribb's failure to follow the Handbook's procedural requirement that, if an election is not ratified, the Dean must disclose the reasons to the Department. Deviation from internal policy can, in some circumstances, support an inference of pretext. *Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017). The question remains, though, whether her deviation suggests that her stated reason was a lie masking retaliation.

Gribb recalled not ratifying an election in another department, and in that instance she did discuss her reasons for non-ratification with the department. She explained that the candidate lacked the leadership and administrative qualities necessary to succeed. That example demonstrates that she has, in other circumstances, declined to ratify an elected Chair based on perceived deficiencies in leadership skills, precisely the type of concern she identified in Plaintiff's case, and followed procedure in meeting with that department. Here, Gribb testified that she did not convene the

32

Finance Department because Defendant had begun exploring a merger of the Finance and Economics Departments, which would eliminate the need for a separate Chair for the Finance Department. Plaintiff presents no evidence that the merger explanation was fabricated or that the procedural deviation was uniquely applied to Plaintiff because of his protected activity.

At most, the evidence shows that Zakahi did not like or trust Plaintiff to be Chair of the Finance Department due to the events leading to his removal as Chair in 2017; Zakahi "influenced" Gribb in this respect by making his position known; and Gribb did not ratify, at least in part, because her boss, Zakahi, did not want her to ratify. That is not enough to suggest that Gribb did not ratify Plaintiff's 2022 election because of his 2018 lawsuit against Defendant.

**Viewing the Evidence as a Whole**

Based on the totality of the evidence, Plaintiff has not demonstrated a genuine issue of material fact that his 2018 lawsuit was the "but-for" cause behind Gribb's decision to not ratify his election as Finance Department Chair, and no reasonable jury could find causation in support of Plaintiff's Title VII and ADEA retaliation claims. Even considering the ambiguous statements, Gribb's failure to follow the Handbook following her decision not to ratify Plaintiff's election, and whatever influence Zakahi had on Gribb's decision, the court, for all the reasons stated above, finds that Plaintiff has not presented enough evidence to allow a jury to find in his favor because there is no evidence in the record beyond speculation on Plaintiff's part that his 2018 lawsuit played any role in the adverse action, as opposed to the toxic environment and poor

33

leadership that caused his removal as Chair back in 2017. Even if the 2018 lawsuit did play *some* role in Zakahi and/or Gribb's actions towards Plaintiff, the court certainly cannot say that those actions would not have happened *absent* the lawsuit. See *Xiong*, 62 F.4th at 355. Because Plaintiff cannot demonstrate a genuine issue of material fact that improper retaliatory animus caused the adverse action, summary judgment must enter in favor of Defendant. See *Igasaki*, 988 F.3d at 957-58. Defendant's Motion for Summary Judgment is GRANTED.

IT IS THEREFORE ORDERED THAT:

(1) Defendant's Motion for Summary Judgment (#28) is GRANTED. Judgment is entered in favor of Defendant Bradley University and against Plaintiff Amit Sinha.

(2) This case is terminated.

ENTERED this 23rd day of March, 2026.

s/Colin Stirling Bruce
COLIN S. BRUCE
CHIEF U.S. DISTRICT JUDGE